2014 COA 35

**The PEOPLE of the State of Colorado,
Plaintiff–Appellee,**

**v.**

**Dallas CARDENAS, Defendant–Appellant.**

**Court of Appeals No. 11CA1954**

Colorado Court of Appeals,
Div. V.

Announced March 27, 2014

John W. Suthers, Attorney General, Michael D. McMaster, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Law Office of Suzan Trinh Almony, Suzan Trinh Almony, Broomfield, Colorado, for Defendant-Appellant

Opinion by JUDGE BERNARD

¶ 1 Does proof that a defendant arranged for another person to purchase sexual services performed by a child satisfy the elements of the crime of trafficking in children? Based on the statute's plain language, we conclude that the answer to this question is "no." We further conclude that the prosecution must prove something else to satisfy those elements, such as showing that a defendant transferred physical or legal custody of the child to another person permanently or for a defined period in exchange for money or other consideration.

¶ 2 A jury convicted defendant, Dallas Cardenas, of trafficking in children and several other prostitution-related felonies. He contends in this appeal that the evidence submitted at trial was insufficient to satisfy the elements of the crime of trafficking in children. We agree with this contention. We therefore reverse his conviction for that crime, vacate that conviction and the sentence for that conviction, and remand the case to the trial court to enter a judgment of acquittal on that charge.

¶ 3 But we disagree with defendant's argument that the trial court erred when it admitted evidence about a tattoo on his arm. Therefore, we affirm defendant's convictions for pimping an adult, pimping a child, pandering a child, and inducing child prostitution.

## I. Background

¶ 4 The victim, a seventeen-year-old girl, met defendant, an eighteen-year-old man, at a rave in March 2010. They became friends. In May 2010, the victim spent some nights at defendant's apartment.

¶ 5 Defendant offered the victim a "business" proposition in which they would be partners. He suggested that he post advertisements on the Internet stating that the victim would provide massages. The callers who responded to the advertisements "would be expecting sex." The victim tacitly agreed to this business model.

¶ 6 In May 2010, defendant arranged to post the first advertisement on an adult services website that referred to the victim as "Texas Girl." It stated: "My name is [ ]. I love the city life and trying new things and meeting new people. I do front, back, and full body massage[s], and I have the hands of a[g]oddess!" The advertisement added that persons interested in purchasing massages could call a telephone number. The number belonged to the victim's cellular telephone.

¶ 7 Men started calling soon after the advertisement was posted. Defendant listened to the conversations on the telephone's speaker. He coached the victim to ask the callers to "talk dirty" to her in an effort to weed out undercover police officers. (Defendant apparently labored under the mistaken impression that police officers are not allowed to "talk dirty" in the course of their undercover investigations.) He also instructed her to tell the callers that her rates were $150 for one-half hour and $175 for one hour.

¶ 8 The victim met with six or seven of these callers over the course of the next few days. A third person drove defendant and the victim to the place where the victim had arranged to meet the callers. She engaged in sex acts with each of these men. She then gave all the money that the men paid her to defendant, and he returned some of it to her.

¶ 9 The victim invited one of her friends, who was eighteen years old, to stay with her at defendant's apartment. Defendant convinced the friend to participate in the criminal business, too, and the friend engaged in several acts of prostitution.

¶ 10 The criminal business collapsed when the police arrested the friend during a sting operation. The friend's statements led the police to defendant, the victim, and others who were part of the business.

¶ 11 A grand jury indicted defendant for the class two felony of trafficking in children because the victim was seventeen years old. It also indicted him for the class three felonies of pimping a child, pimping an adult, pandering a child, inducing child prostitution, and trafficking in adults.

¶ 12 At trial, the friend testified that, during the time when defendant was pimping her, she went with him to a tattoo parlor. Defendant got a tattoo on his forearm of the letters "MOB." Defendant told the friend that "MOB" meant "[m]oney [o]ver [b]itches."

¶ 13 Defendant's counsel objected to this testimony. He argued that it was irrelevant and "unduly prejudicial." The trial court overruled the objection.

¶ 14 Defendant asked the trial court to enter a judgment of acquittal on the trafficking in children and trafficking in adults charges. He argued that the prosecution's evidence was insufficient as a matter of law to prove the elements of those offenses. The court denied this request. (The jury hung on the trafficking in adults charge during its deliberations. The prosecution later dismissed that charge.)

¶ 15 There are two jury instructions that are pertinent to our analysis. First, Instruction 16 listed the elements of the crime of trafficking in children:

1. That the defendant,

2. in the State of Colorado, between and including May 1, 2010, and May 22, 2010,

3. knowingly,

4. sold, exchanged, bartered, or leased a child under the age of 18 years, and

5. received any money or consideration for the child under the age of 18 years.

¶ 16 Instruction 20 provided the following definitions that defendant had requested:

"BARTER" is defined as exchanging goods or services without using money.

"LEASE" is defined as a contract by which one owning such property grants to another the right to possess, use[,] and enjoy it for a specified period of time in exchange for periodic payment of a stipulated price, referred to as rent.

"SELL" is defined as to dispose of by sale.

"EXCHANGE" is defined as to part with, give[,] or transfer for an equivalent.

¶ 17 (The trial court overruled the prosecution's objections to these definitions. The prosecution has not filed a cross-appeal contesting that ruling.)

¶ 18 While the jury was deliberating, it asked the trial court the following questions, and the court gave the following answers:

- Question: "Does one human need to own or control another person to sell, exchange[,] barter[,] or lease [him or her]?"

- Answer: "[The court] can only refer you to the definitions in [I]nstruction 20."

- Question: "Is there a legal definition of trafficking?"

- Answer: "Trafficking is defined by its elements as set forth in [Instruction 16]. That is the only definition [the court] can give you under the law."

¶ 19 The jury convicted defendant of trafficking in children, pimping an adult, pimping a child, pandering a child, and inducing child prostitution. The court sentenced him to eight years in prison for trafficking in children, a concurrent eight-year sentence for pimping an adult, and concurrent four-year sentences for pimping a child, pandering a child, and inducing child prostitution.

## II. Trafficking in Children

¶ 20 Defendant contends that the trial court erred when it denied his motion for judgment of acquittal on the trafficking in children charge because the evidence was not sufficient to support a conviction on that charge. We agree.

¶ 21 "[J]udgment of acquittal must be entered where the evidence is insufficient to support the jury's verdict of guilty." *People v. Sprouse*, 983 P.2d 771, 776 (Colo.1999); *see*

*also* Crim. P. 29. Courts review this evidence "in the light most favorable to the prosecution." *Dempsey v. People,* 117 P.3d 800, 807 (Colo.2005). But, the evidence must be both "substantial and sufficient to support the defendant's guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted). We "review the record de novo to determine whether the evidence before the jury was sufficient both in.quantity and quality to sustain the convictions." *Id.*; *Montes–Rodriguez v. People,* 241 P.3d 924, 927 (Colo. 2010).

¶ 22 And when the inquiry involves issues of statutory construction and application, we also review those issues de novo. *Montes–Rodriguez,* 241 P.3d at 927. In construing a statute, we strive to "effectuate the legislature's intent." *Id.* We first consider the "plain and ordinary meaning of the statutory language." *People v. Voth,* 2013 CO 61, ¶ 21, 312 P.3d 144 (internal quotation marks omitted). We refer to recognized dictionary definitions to determine the ordinary meaning of words. *Griego v. People,* 19 P.3d 1, 9 (Colo. 2001). We avoid interpretations that would lead to "illogical or absurd result[s]." *Frazier v. People,* 90 P.3d 807, 811 (Colo.2004). And, where a provision exists as part of a "statutory scheme," it "must be understood, when possible, to harmonize the whole." *BP Am. Prod. Co. v. Patterson,* 185 P.3d 811, 813 (Colo.2008).

¶ 23 A person commits trafficking in children if he "[s]ells, exchanges, barters, or leases a child and receives any money or other consideration or thing of value for the child as a result of such transaction." § 18–3–502(1)(a), C.R.S.2013. A child is "a person under eighteen years of age." § 18–3–502(2). The statute does not define the terms "sell," "exchange," "barter," or "lease."

¶ 24 We conclude that section 18–3–502's plain language prohibits the sale, exchange, barter, or lease of a *child,* but not the sale, exchange, barter, or lease of a child's *services.* We reach this conclusion for the following reasons.

¶ 25 The ordinary meaning of the verbs "sell," "exchange," "barter," and "lease" involves the transfer of a right of ownership or possession. *See Voth,* ¶ 21 (We first consider the "plain and ordinary meaning of the statutory language." (internal quotation marks omitted)); *Griego,* 19 P.3d at 9 (we refer to dictionary definitions to determine the ordinary meaning of words).

¶ 26 "Sell" means "[t]o transfer (property) by sale." *Black's Law Dictionary* 1391 (8th ed. 2004). "Sale" means "[t]he transfer of property or title for a price." *Id.* at 1364; *accord* § 4–2–106(1), C.R.S.2013 (The Uniform Commercial Code defines "sale" as "the passing of title from the seller to the buyer for a price."). The common usage of the term "sale" "refer[s]" to a contract whereby the *ownership of property* is transferred from one person to another for a sum of money or other valuable consideration." *State Dep't of Revenue v. Adolph Coors Co.,* 724 P.2d 1341, 1351 (Colo.1986) (Quinn, C.J., dissenting) (emphasis added). *See also Wilson v. Frederick R. Ross Inv. Co.,* 116 Colo. 249, 257, 180 P.2d 226, 230 (1947) (sale means a contract between parties "to give and to pass rights of property for money").

¶ 27 "Exchange" means "[t]he act of transferring interests, each in consideration for the other." *Black's Law Dictionary* at 604. Common usage defines the word "exchange" to mean "the act of giving or taking one thing in return for another," or "the act of substituting one thing for another." *Sternal v. Fagan,* 989 P.2d 200, 202–03 (Colo.App. 1999) (internal quotation marks omitted).

¶ 28 "Barter" means "[t]he exchange of one commodity for another without the use of money." *Black's Law Dictionary* at 160.

¶ 29 "Lease" means "[t]o grant the possession and use of (land, buildings, rooms, movable property, etc.) to another in return for rent or other consideration[.]" *Id.* at 909. A lease "gives the right of possession of the property leased, and exclusive use or occupation of it for all purposes not prohibited by its terms." *Am. Coin–Meter of Colo. Springs, Inc. v. Poole,* 31 Colo.App. 316, 318, 503 P.2d 626, 627 (1972).

¶ 30 (These definitions do not differ in any significant way from the ones that the trial court read to the jury in this case.)

¶ 31 Applying the rules of grammar, these words are transitive verbs as they are used in section 18–3–502(1)(a). Their direct object is "a child." Thus, to prove that a defendant has violated section 18–3–502(1)(a), the prosecution must establish that the defendant sold a child, exchanged a child, bartered a child, or leased a child.

¶ 32 But the common usages of these verbs describe transactions involving property, and children are not property. No one, not even a parent, "owns" a child in the sense that one owns property. *United States v. Fazal–Ur–Raheman–Fazal,* 355 F.3d 40, 55 (1st Cir.2004) ("We ... have found nothing in the case law or legislative history [of a federal restitution statute] that characterizes children either as traditional restitution or as in-kind payments.... Children are not 'property' nor is their transfer a 'service[.]' "); *In re Appeal in Maricopa Cnty. Juvenile Action No. J–75482,* 111 Ariz. 588, 536 P.2d 197, 199 (1975) ("[C]hildren are not property of their parents whose control may only be interrupted by a finding of fault; on the contrary, ... children ... have special needs and rights ... protected by law."); *Welch v. Welch,* 195 S.W.3d 72, 78 (Tenn.Ct.App.2005) ("Children are not property and are not disposable as a matter of convenience. This truth is foundational to the statutory child support, custody, and adoption scheme developed by our legislature and applied by our courts.").

¶ 33 Indeed, the Thirteenth Amendment to the United States Constitution prohibits the "ownership" of human beings—slavery—throughout the United States. *See also* Colo. Const. art. II, § 26 ("There shall never be in this state ... slavery[.]"); *Civil Rights Cases,* 109 U.S. 3, 20, 3 S.Ct. 18, 27 L.Ed. 835 (1883) (The Thirteenth Amendment "is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.").

¶ 34 But the existence of these absolute prohibitions does not mean that the practice of buying and selling children has vanished in this country. Here are two examples:

• Desperate or unscrupulous parents may try to sell their children on a black market and thus avoid the legal adoption process. *See In re Adoption of Baby Boy A,* 236 P.3d 116, 122 (Okla.2010) ("Oklahoma has a strong public policy against buying or selling children for adoption."); *In re Baby M.* [109 N.J. 396], 537 A.2d 1227, 1241 (N.J.1988) ("The evils inherent in baby-bartering are loathsome for a myriad of reasons. The child is sold without regard for whether the purchasers will be suitable parents. The natural mother does not receive the benefit of counseling and guidance to assist her in making a decision that may affect her for a lifetime. In fact, the monetary incentive to sell her child may, depending on her financial circumstances, make her decision less voluntary. Furthermore, the adoptive parents may not be fully informed of the natural parents' medical history." (citations and footnote omitted)); *Matter of Adoption of E.W.C.* [89 Misc.2d 64], 389 N.Y.S.2d 743, 751–52 (N.Y.Sur.1976) (describing a "flourishing" interstate "baby-selling business in New York, Florida, Pennsylvania and Ohio"); Lynn D. Wardle, *Parentlessness: Adoption Problems, Paradigms, and Parameters,* 4 Whittier J. Child & Fam. Advoc. 323, 347 (2005) ("[O]ne major concern about international adoptions is the potential for black market baby-selling, kidnapping, and trafficking in children." (internal quotation marks omitted));

• American or foreign child traffickers may sell orphaned or abandoned children into forced labor or sexual slavery. *See United States v. King,* 840 F.2d 1276, 1282–83 (6th Cir.1988) (describing contracts in which parents who left the compound of a religious cult would agree to "leave their children behind"); Rachel Stevens, *The Trafficking of Children: A Modern Form of Slavery, Using the Alien Tort Statute to Provide Legal Recourse,* 5 Whittier J. Child & Fam. Advoc. 645, 649–50 (2006) (after the 2004 tsunami decimated parts of Asia, "predators" exploited the desire of Americans to adopt displaced children, and these predators also "exploit[ed] the children by sending them to be domestic servants, sex slaves, and pros-

titutes, as well as other forms of involuntary servitude and slavery"); Jorene Soto, *Show Me the Money: The Application of the Asset Forfeiture Provisions of the Trafficking Victims Protection Act and Suggestions for the Future*, 23 Penn. St. Int'l L.Rev. 365, 365 (2004) ("Trafficking in persons, a modern-day type of slavery in which people, especially women and children, are sold into forced labor and sexual servitude, is a financially lucrative crime that is prevalent throughout the world."); Holly C. Kennard, *Curtailing the Sale and Trafficking of Children: A Discussion of the Hague Conference Convention in Respect of Intercountry Adoptions*, 14 U. Pa. J. Int'l Bus. L. 623 (1994) (discussing international efforts to curtail a "small but thriving 'baby black market'").

¶ 35 Based on the foregoing authority and on our analysis of the common usage of the words, "sale," "exchange," "barter," and "lease," we conclude, as did the Maryland Court of Appeals when interpreting a similar statute, that Colorado's trafficking in children statute "ordinarily reaches the consent to a transfer of the physical and legal custody of a child for money." *State v. Runkles*, 326 Md. 384, 605 A.2d 111, 120 (1992).

¶ 36 The evidence in this case described a transaction that is different from those that we have listed above involving the practice of buying and selling children. Defendant arranged for the seventeen-year-old victim to provide sexual services. In doing so, he advertised, facilitated, and profited from those services. As a result, the jury convicted him of pimping a child, pandering a child, and inducing child prostitution.

¶ 37 But the evidence does not establish that he "sold," "exchanged," "bartered," or "leased" the victim. The Internet advertisement did not state that the *victim* was for sale, exchange, barter, or lease. Rather, it stated that the victim would provide a service by "do[ing] ... massage." And the evidence showed that, when the victim met with the callers, they agreed only to purchase that service; they did not obtain any right to "possess" her.

¶ 38 In other words, there is no evidence that defendant facilitated the transfer of the victim's physical or legal custody to the callers. *See id.* at 120. Therefore, the evidence presented at trial was not "sufficient both in quantity and quality," *see Dempsey,* 117 P.3d at 807, to prove beyond a reasonable doubt that defendant committed the crime of trafficking in children.

¶ 39 When we view it as a whole, the statutory scheme of "human trafficking and slavery" defined in, and prohibited by, title 18, article 3, part 5 of Colorado's Revised Statutes, supports this conclusion. Section 18–3–503, C.R.S.2013, which prohibits coercion of involuntary servitude, expressly prohibits a person from "coerc[ing] another" to "perform labor or services." If the legislature intended for the trafficking in children statute to apply to services, it would have said so, as it has in section 18–3–503. *See BP Am. Prod. Co.*, 185 P.3d at 813.

¶ 40 We also note that the language used in Colorado's trafficking in children statute is unusual when compared to the language used in other jurisdictions' child trafficking statutes. Most of these statutes prohibit a person from "recruiting," "enticing," "soliciting," "inducing," "threatening," or "transporting" a child for sexual purposes, or otherwise "benefitting from" any of those acts if they were committed by another. *See* 18 U.S.C. § 1591 (2008); Ala.Code §§ 13A–6–150 to –160 (2014); Alaska Stat. §§ 11.66.110 to .135 (2014); Ariz.Rev.Stat. Ann. §§ 13–1306 to –1308 (2014); Ark.Code Ann. §§ 5–18–101 to 104 (2014); Cal.Penal Code §§ 236 to 236.12 (2014); Conn. Gen.Stat. § 53a–192a (2014); Del.Code Ann. tit. 11, § 787(b)(2) (2014); D.C.Code §§ 22–1831 to –1836 (2014); Fla. Stat. § 787.06 (2014); Haw.Rev.Stat. §§ 707–780 to –782 (2014); Idaho Code Ann. §§ 18–8601 to –8603 (2014); 720 Ill. Comp. Stat. 5/10–9 (2014); Ind.Code § 35–42–3.5–1 (2014); Iowa Code §§ 710A.1 to .2a (2014); Kan. Stat. Ann. § 21–5426 (2014); Ky.Rev.Stat. Ann. § 529.100 to .110 (West 2014); La.Rev. Stat. Ann. § 14:46.2 (2014); Me.Rev.Stat. Ann. tit. 17–A, §§ 852–853 (2014); Mass. Gen. Laws. ch. 265, § 50 (2014); Mich. Comp. Laws. §§ 750.462a to .462j (2014); Minn.Stat. § 609.322 (2014); Miss.Code Ann.

§ 97–3–54.1(2014); Mo.Rev.Stat. § 566.212 (2014); Mont.Code Ann. §§ 45–5–305, 306, 310 (2014); Neb.Rev.Stat. §§ 28–830 to –831 (2014); N.H.Rev.Stat. Ann. § 633:7 (2014); N.J. Stat. Ann. § 2C: 13–8 (2014); N.M. Stat. Ann. § 30–52–1 (2014); N.Y. Penal Law § 230.34 (McKinney 2014); N.C. Gen.Stat. §§ 14–43.10 to –43.20 (2014); N.D. Cent. Code § 12.1–40–01 to –40–02 (2014); Ohio Rev.Code Ann. § 2905.32 (West 2014); Okla. Stat. tit. 21, §§ 865 to 869 (2014); Or.Rev. Stat. § 163.266 (2014); 18 Pa. Cons.Stat. §§ 3001 to 3002 (2014); R.I. Gen. Laws § 11–67–3 (2014); S.C.Code Ann. §§ 16–3–2010 to –2020 (2014); S.D. Codified Laws § 22–49–1 to –3 (2014); Tenn.Code Ann. § 39–13–309 (2014); Tex. Penal Code Ann. § 20A.01 to .03 (West 2013); Utah Code Ann. § 76–5–308 to –310 (West 2014); Vt. Stat. Ann. tit. 13, §§ 2651 to 2653 (2014); Wash. Rev.Code § 9A.40.100 (2014); W. Va.Code § 61–2–17 (2014); Wis. Stat. § 940.302 (2014); Wyo. Stat. Ann. § 6–2–701 to –706 (2014).

¶ 41 Colorado's statute does not include such language. This difference led one commentator to observe that Colorado's "odd" trafficking in children statute "may not ... adequately capture[ ] all instances of domestic minor sex trafficking, which involves the sale of commercial sex rather than the sale of the actual child." Tessa L. Dysart, *The Protected Innocence Initiative: Building Protective State Law Regimes for America's Sex–Trafficked Children*, 44 Colum. Hum. Rts. L.Rev. 619, 649, 670 (2013).

¶ 42 We would reach the same result even if we were to conclude that the language of the statute is ambiguous. If statutory language is ambiguous, we may consider the statute's "legislative history and declarations of purpose" to determine the legislature's intent. *People v. Sexton*, 296 P.3d 157, 161 (Colo.App.2012).

¶ 43 The legislature enacted the predecessor to section 18–3–502 in 1977. Ch. 230, secs. 1–3, § 18–6–402, 1977 Colo. Sess. Laws 981. The elements of the crime, which we have already discussed in detail, have not changed in the intervening thirty-seven years.

¶ 44 The sponsor of the bill that led to this statute explained that there were two rea-

sons for the proposed law. First, he described events in Colorado Springs in which a couple had "leased" their nine-year-old son to a man several times over a period of three years for "sexual purposes." The man paid the parents cash, and he then travelled around the country with the child. Once the parents had spent all the money that the man had given them, the man returned the child. The man later asked the parents if he could "have the child again"; he gave them more money; and he again took possession of the child. The child spent "months" with the man during those three years.

¶ 45 Second, the sponsor stated that the statute would also apply if a person "were to sell a child into bondage" or "leas[e] [a child] for hard work or slave labor." He added that "[a]pparently there is no law in [any state in] the United States ... that outlaws the sale or leasing of children, and I think perhaps there ought to be."

¶ 46 This legislative history supports our analysis. It makes clear that the legislative purpose for the statute was to prohibit persons from transferring physical or legal custody of children to others, temporarily or permanently, in exchange for money or other consideration.

¶ 47 Because we conclude that the evidence in the record does not support defendant's conviction for trafficking in children, we reverse and vacate that conviction and sentence, and we remand this case to the trial court to enter a judgment of acquittal on that charge. As a result, we need not address defendant's other arguments related to that charge.

¶ 48 (Our holding will not reduce defendant's sentence because the trial court imposed the eight-year sentence for trafficking in children concurrently with the eight-year sentence for pimping an adult and with the four-year sentences for pimping a child, pandering a child, and inducing child prostitution. And defendant did not ask us—probably for that reason—to order the trial court to resentence him.)

### III. Tattoo Evidence

¶ 49 Defendant contends that the trial court erred when it admitted evidence about his tattoo. We disagree.

¶ 50 We review a trial court's evidentiary rulings for abuse of discretion. *People v. Ibarra*, 849 P.2d 33, 38 (Colo.1993). "In deciding issues of admissibility, a trial court has broad discretion to determine the relevancy of evidence, its probative value and its prejudicial impact." *Kaufman v. People*, 202 P.3d 542, 553 (Colo.2009) (internal quotation marks omitted). A trial court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair." *People v. Stewart*, 55 P.3d 107, 122 (Colo.2002).

¶ 51 All relevant evidence is admissible unless prohibited by constitution, statute, or court rule. CRE 402; *Kaufman*, 202 P.3d at 552; *People v. Cordova*, 293 P.3d 114, 118 (Colo.App.2011). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Evidence of a defendant's tattoos may be relevant to that defendant's intent and motive. *See People v. Skinner*, 53 P.3d 720, 723 (Colo.App.2002) (tattoo evidence was relevant because it "made it more probable that [the] defendant possessed the [requisite] intent" and "provid[ed] an explanation for [the] defendant's actions").

¶ 52 But relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." CRE 403. "All effective evidence is prejudicial in the sense that it is damaging to the party against whom it is being offered." *People v. Fasy*, 813 P.2d 797, 800 (Colo.App. 1991), *rev'd on other grounds*, 829 P.2d 1314 (Colo.1992). And such evidence is only excluded where it has "some undue tendency to suggest a decision on an improper basis, commonly an emotional basis, such as bias, sympathy, hatred, contempt, retribution, or horror." *Id.* In reviewing whether evidence should have been excluded under CRE 403, "we must assume the maximum probative value that a reasonable factfinder might give to the evidence and the minimum unfair prejudice that might reasonably be expected." *Skinner*, 53 P.3d at 723.

¶ 53 Under CRE 404(b), evidence of defendant's "other acts" is "not admissible to prove the character of a person in order to show that he acted in conformity therewith." But evidence of other acts "that are part and parcel of the criminal episode is admissible as *res gestae*." *People v. Martinez*, 24 P.3d 629, 633 (Colo.App.2000) ("*Res gestae* evidence provides the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred, including events closely related in time and nature to the charged offense."); *see also People v. Quintana*, 882 P.2d 1366, 1373 (Colo.1994). And *res gestae* evidence is not subject to CRE 404(b). *Martinez*, 24 P.3d at 633; *Quintana*, 882 P.2d at 1373.

¶ 54 We note that neither the prosecution nor the trial court relied on CRE 404(b) as the basis for admitting the evidence of defendant's tattoo. And defendant's only objection at trial was that the evidence was irrelevant and "unduly prejudicial." On appeal, defendant provides alternative arguments concerning this evidence: (1) this evidence was not admissible because it was not relevant and because "its prejudicial effect outweighed" its "minimal" probative value; and (2) under CRE 404(b), "[a]ny relevance ... depended on an intermediate inference that [defendant] had bad character."

¶ 55 We conclude that the tattoo evidence was relevant, that it was *res gestae* rather than CRE 404(b) evidence, and that it was not unduly prejudicial for two reasons.

¶ 56 First, the victim's friend testified that she was with defendant when he got the tattoo during the same period when the victim and the friend were engaged in defendant's prostitution ring. The friend stated that defendant told her the tattoo meant "[m]oney [o]ver [b]itches." And the prosecution argued at trial that the term "money over bitches" showed that defendant had a "calculated plan to exploit" the victim and her friend, that he "put a price tag" on them, and that the phrase was "a sex trafficker's motto." Thus, the evidence

- tended to increase the jury's understanding of the events surrounding the crimes and the context in which those

crimes occurred, *see Martinez*, 24 P.3d at 633;

- was "closely related in time and nature to the charged offense[s]" of pimping and trafficking of the victim and her friend, *id.*;
- "provide[d] the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred," *id.*; and
- tended to make proof of defendant's intent "more probable ... than it would be without the evidence[,]" CRE 401; *Skinner*, 53 P.3d at 723.

¶ 57 Second, the evidence of the tattoo had "little, if any, prejudicial effect" because

- the tattoo merely depicted the letters "MOB" on defendant's arm, and there is no evidence in the record indicating that defendant was a gang member or otherwise affiliated with organized crime. *See People v. Dunlap*, 975 P.2d 723, 744 (Colo. 1999) (tattoo evidence "had little, if any, prejudicial effect, for it depicted simply a horse's head beneath the words 'Crazy Horse.' "); and
- the fact that the jury knew that defendant had the letters "MOB" tattooed on his arm does not suggest that the jury made its decision based on "bias, sympathy, hatred, contempt, retribution, or horror." *See Fasy*, 813 P.2d at 800.

¶ 58 Therefore, because we conclude that the trial court's decision to admit the friend's testimony about the tattoo was not error, we affirm defendant's convictions for pimping an adult, pimping a child, pandering a child, and inducing child prostitution.

## IV. Conclusion

¶ 59 The judgment is reversed in part and affirmed in part, the conviction and sentence for trafficking in children are vacated, and the case is remanded to the trial court to enter a judgment of acquittal on the charge of trafficking in children.

JUDGE GRAHAM concurs.

JUDGE BERGER, specially concurs.

JUDGE BERGER, specially concurring.

¶ 60 I agree with the majority that defendant's conviction of the crime of trafficking in children, section 18–3–502(1)(a), C.R.S.2013, must be reversed for insufficient evidence. But I cannot agree with the construction of the statute imposed by the majority, which fails to implement the intent of the General Assembly and is neither compelled by any constitutional command nor by any principle of statutory construction.[1]

¶ 61 Like the majority, I begin with the language of the statute. The statute criminalizes the sale, lease, exchange, or barter of a child. None of those terms, other than "child," is defined in the statute. The lack of statutory definitions, however, is no impediment to the application of the statute as written. Because these are terms of common usage, within the normal contemplation of jurors, looking to the dictionary for definitions is appropriate. *See People v. Gallegos*, 260 P.3d 15, 22 (Colo.App.2010) ("When a statute does not define its terms but the words used are terms of common usage, we may refer to dictionary definitions to determine the plain and ordinary meaning of those words." (internal quotation marks omitted)).

¶ 62 After locating dictionary definitions for the terms "sell," "exchange," "barter," and "lease," the majority properly recognizes that no one owns a child in the sense that one owns property, not even a parent. But from that truism, the majority leaps to the conclusion that only if someone has legal or physical custody of the child can there be a criminal conviction under the statute. In so doing, the majority effectively limits the reach of the statute to the permanent sale of a child for purposes of black market adoption or the sale or long-term lease of a child into sexual slavery.

---

1. Defendant did not raise any constitutional challenges to his conviction, such as an equal protection challenge, *see People v. Goodale*, 78 P.3d 1103, 1106 (Colo.2003), or a due process void for vagueness challenge, *see People v. Longoria*, 862 P.2d 266, 269–70 (Colo.1993). As a result, there is no basis for the Majority or me to address any such challenges.

¶ 63 Colorado has a separate statute that criminalizes the sale of a child for adoption. § 19–5–213(1)(a), C.R.S.2013 (prohibiting the receipt of "money or other consideration or thing of value in connection with the relinquishment and adoption" of a child). That the General Assembly intended the trafficking in children statute to address the same issue—the transfer of the custody of a child for money—seems unlikely.[2]

¶ 64 Nor is assuming that the General Assembly had any desire to limit the reach of the trafficking statute to the circumstances described by the majority, in which a child is sold or leased into sexual slavery, reasonable. Yet, the majority's construction of the statute immunizes from the reach of the statute a great deal of heinous conduct that the General Assembly had every right to prohibit— conduct which I am convinced the General Assembly intended to criminalize.

¶ 65 If the statute is limited to prohibiting only the transfer of custody for money, the conduct described by an expert in this case as constituting a typical trafficking situation—the recruitment and grooming of a child, often by the use of force, fraud, or coercion, to manipulate the child into performing sexual acts—often would be punishable only under the pimping of a child, pandering, and inducement of child prostitution statutes. However, the scenario described by the expert clearly involves conduct that goes beyond that covered by these three statutes. See § 18–7–405, C.R.S.2013 (defining "pimping of a child"); § 18–7–203(1), C.R.S.2013 (defining "pandering"); People v. Hansen, 708 P.2d 468, 470 (Colo.App.1985) (defining "inducement of child prostitution" under section 18–7–405.5, C.R.S.2013).

¶ 66 Additionally, almost every other state's human trafficking statute defines "trafficking" to encompass the type of conduct the expert described. See, e.g., Tex. Penal Code Ann. §§ 20A.01–20A.02(a)(3) (West 2013) (defining " '[t]raffic' " as "to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means" and providing that a person commits the offense of "trafficking of persons" if, among other things, he or she "knowingly traffics another person and, through force, fraud, or coercion, causes the trafficked person to engage in" prostitution, promotion of prostitution, or compelling prostitution). I do not agree with the majority that the difference in language in Colorado's trafficking statute necessitates the conclusion that the General Assembly did not intend "trafficking" to mean what it does in almost every other state.

¶ 67 Moreover, the language of Colorado's trafficking in adults statute, section 18–3–501(1)(a), C.R.S.2013, is the same as that of the trafficking in children statute. This similarity also supports the conclusion that the General Assembly intended to criminalize conduct that does not reach the level of transferring the custody of a child for money. Other than situations in which an adult is under the legal guardianship of another person, to speak of transferring the physical and legal custody of an adult makes no sense. Because there is no indication that the language in section 18–3–501 should be interpreted differently than the same language in section 18–3–502, the terms "sell," "exchange," "barter," and "lease" in both statutes must mean something other than the transfer of custody for money. See Marquez v. People, 2013 CO 58, ¶ 8, 311 P.3d 265 ("[I]n the absence of some express indication to the contrary, a term or provision that is part of a greater statutory scheme should be interpreted, to the extent possible, harmoniously with the other provisions and purpose of that scheme.").

¶ 68 The limited legislative history that is available further shows that the limiting construction placed upon the statute by the majority is unwarranted. In 2010, the General Assembly enacted S.B. 140, which moved the

---

2. I also find the Majority's reliance on State v. Runkles, 326 Md. 384, 605 A.2d 111 (1992), misplaced. The Maryland court in Runkles explicitly stated its holding was limited to whether a statute prohibiting the sale of a minor covered "consent to the relinquishment of the custody of a child upon payment of money." Id. at 120.

The court emphasized it was not determining the entire reach of the statute. Id. Maryland also has a separate statute that addresses human trafficking. Md.Code Ann., Crim. Law § 11–303(c) (West 2013). I thus disagree that Runkles is useful for interpreting Colorado's trafficking in children statute.

trafficking statutes into the article of the criminal code that addresses crimes against the person. Ch. 156, sec. 1, §§ 18–3–501, 18–3–502, 2010 Colo. Sess. Laws 535–36. In testimony before the Senate Committee on the Judiciary, Senator Shawn Mitchell, the prime sponsor of S.B. 140, explained that the bill's intent was to strengthen the laws already on the books and allow perpetrators to be more aggressively prosecuted and more thoroughly punished. *Hearing on S.B. 140 before the S. Judiciary Comm.*, 67th Gen. Assemb., 2d Sess. (Feb. 17, 2010).

¶ 69 Senator Mitchell also discussed a proposal amending the trafficking statutes to read: "A person commits trafficking in children [or adults] if he or she: [s]ells, exchanges, barters, or leases a child [or adult] *by means of force, fraud, or coercion ...*." *Id.*; S.B. 140, 67th Gen. Assemb., 2d Reg. Sess. (Colo. 2010) (as assigned to S. Comm. on Judiciary, Feb. 4, 2010) (emphasis added). In explaining why the added the language was contemplated—to distinguish selling someone from the possibly legal situation of selling his or her labor, thereby avoiding potential vagueness challenges—Senator Mitchell stated, "I believe with or without the inserted phrase, a case of genuine control of another human being of servitude will be able to be proved." *Hearing on S.B. 140 before the S. Judiciary Comm.* (emphasis added). The Committee ultimately decided not to include the phrase because of concerns that it would make the law more difficult to prosecute. *Id.*

¶ 70 This legislative history shows that the General Assembly sought to enact a very broad trafficking in children statute, indeed even broader than the sister-state statutes cited by the majority for the proposition that the Colorado statute should be limited in reach. *See Vensor v. People*, 151 P.3d 1274, 1279 (Colo.2007) ("While by no means conclusive, the testimony of a bill's sponsor concerning its purpose and anticipated effect can be powerful evidence of legislative intent.").

¶ 71 In reaching its limiting construction, the majority also distinguishes between the sale of the child and the sale of services by the child. It then concludes that the statute applies to the sale of a child, not the sale of the child's services; because a person cannot "own" a child, the statute must apply to the transfer of custody of a child for money. In my view, the distinction between the sale of a child and the sale of the child's services, in the context of the activities at issue in a sex trafficking case, is a distinction without a difference. The "services" engaged in by a victim of sex trafficking are not ordinary services. They are sexual "services." In a very real sense, either the victim or the trafficker, or both, are selling the victim's body to third persons. Under such circumstances, the distinction relied upon by the majority has little meaning.

¶ 72 A person who has sufficient practical control over a child may use that control to cause the child to provide sexual services to other persons. The expert who testified in this case explained that traffickers find victims who are homeless or runaways, lacking parental figures, or addicted to drugs. They then exploit them by offering to fill their needs, but only if they perform sexual services in exchange.

¶ 73 For instance, traffickers might tell the victims that if they do not perform, they will no longer provide them with the basic necessities of life—shelter, food, and clothing. Or they might threaten to take away the intimacy they had once shown the victims, as traffickers often will feign that they care about the victims or even love them. In this way, according to the expert, traffickers control and manipulate the victims in order to sell them: "They are sold to other people, they are selling themselves to other people and then the trafficker gets them back and resells them.... [T]he commodity, being the human being, is being sold over and over and over again for profit every time."

¶ 74 I agree with the majority that the prosecution must prove something beyond arranging for another person to purchase sexual services performed by a child to satisfy the elements of the crime of trafficking in children. To give effect to what I perceive as the intended broad reach of the statute, I would hold that a defendant violates the statute when (a) he or she sells, barters, exchanges, or leases a child; (b) in circumstances where the defendant has a

substantial degree of practical control over the activities of the child; and (c) receives any money or other consideration or thing of value as a result of such transaction.

¶ 75 The required evidence of practical control need not be physical control. Evidence that the defendant had psychological control over the child is sufficient. The evidence sufficient to support a finding of practical control may vary depending upon the child's age, maturity, and access to other resources, but the critical factor is the defendant's ability to manipulate the child into sexual exploitation.

¶ 76 Here, little or no evidence of such practical control over the victim was presented to the jury. To the contrary, the evidence that was presented demonstrated that the victim continued to live most of the time with her parents; she was not dependent upon defendant either for shelter or food. She testified she always had the capacity to leave defendant's apartment and always had someplace to go. She had a boyfriend other than defendant, and her parents apparently were in the picture, potentially giving her the emotional support that would negate the type of psychological control necessary to give meaning to the statutory terms. Hence, I agree with the majority that the evidence is not sufficient to sustain a conviction for trafficking in children.

¶ 77 I note that the victim spoke at defendant's sentencing. At that time, she addressed precisely the type of control that I believe is central to a conviction under the statute. She stated that defendant sought her out and purposefully targeted her during a very difficult time in her life when she was extremely vulnerable, in part because both she and her father had just lost their jobs. She explained that defendant lured her by making elaborate promises to take care of her and then forced her into unwanted sexual acts. He became furious and threatening when she talked back to him, he stole the money she had in her wallet, and he made her feel worthless. And she described the fear and terror that she felt when she was in his grasp.

¶ 78 Had she given such testimony during the guilt phase of the trial, I would vote to affirm the trafficking conviction. But statements made at the sentencing phase cannot substitute for evidence presented to the jury at the guilt determination phase. Nor can testimony by a witness who is qualified as an expert in the trafficking of children substitute for such "control" testimony. While it may be appropriate for such an expert to opine on the general characteristics and devices commonly utilized by persons engaging in trafficking activities, the expert cannot provide factual evidence regarding the actual control of the victim by defendant.

¶ 79 For these reasons, I concur in the majority's conclusion that the evidence presented to the jury on the trafficking in children charge was insufficient as a matter of law to sustain defendant's conviction of that crime. I respectfully disagree with the majority's analysis in reaching that conclusion and the limiting construction it places upon the statute. I concur in all other portions of the majority's opinion.