23CA0712 Peo v Alarcon 03-26-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0712
Larimer County District Court No. 21CR722
Honorable Stephen J. Jouard, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cruz Victor Alarcon,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE KUHN
Fox and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 26, 2026

---

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Julieanne Farchione, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Cruz Victor Alarcon, was convicted of two counts of possession with intent to distribute a controlled substance.  He appeals his judgment of conviction, seeking a new trial.  We affirm.

## I.     Background

¶ 2     In January 2021, law enforcement received an anonymous tip, alleging that Alarcon and his partner, Sarah Sewolt, were "engaged in the sale and distribution of methamphetamine and fentanyl from their home."  The tip prompted Sergeant Josiah Thiemann to surveil Alarcon and his home.

¶ 3     On April 23, Sergeant Thiemann was surveilling the home.  Around 5:25 p.m., he saw a dark blue or purple truck arrive with a woman driving and a man in the passenger seat.  The man was later identified as Marcelino Moreno, Alarcon's nephew.  The woman remained in the truck while Moreno met Alarcon in the backyard.  Alarcon and Moreno then went into a shed for approximately five minutes and came out with no tools in hand.  Moreno and Alarcon were seen looking down the street and over their shoulders.  Sergeant Thiemann characterized this behavior as being consistent with "countersurveillance."

¶ 4     Moreno returned to the truck, which was still running with the woman in the driver's seat. As the two drove away, Sergeant Thiemann observed Moreno looking in the mirrors "harder than normal." Sergeant Thiemann communicated the truck's description to Deputy Kyle Ryan, who then started following the truck. Deputy Ryan observed Moreno turning around in the truck and "looking at his surroundings." The truck then pulled into a gas station and stopped at a gas pump, but neither Moreno nor the woman pumped any gas. A short time later, Moreno moved the truck from the gas pump to the air station. Moreno picked up the air tube and checked the tires, but he did not fill any of the tires with air.

¶ 5     During this time, Sergeant Thiemann was still surveilling Alarcon's home. He saw Alarcon and Sewolt leave the house in their SUV around 6:18 p.m. The two headed in the direction of the gas station while Sergeant Thiemann followed them. When Alarcon and Sewolt arrived at the gas station, they parked next to the truck. Moreno got out of the truck and entered Alarcon's SUV with a backpack. Alarcon's SUV then pulled out of the gas station. Sergeant Thiemann and Deputy Ryan followed behind Alarcon's SUV until Deputy Ryan could initiate a traffic stop.

¶ 6 Deputy Ryan identified all the passengers in the SUV. He then had them get out of the SUV so that a K-9 unit's trained drug dog could do an initial drug sniff around the outside of the SUV. Based on the results of the dog's sniff, Deputy Ryan concluded that there was probable cause to search the SUV. In the SUV, he found a backpack with a Ziplock baggie containing what appeared to be meth and a grocery bag with a "large quantity of small blue pills" consistent with fentanyl. Deputy Ryan also found a cell phone in the center console. Alarcon was placed under arrest and later charged with two counts of possession with intent to distribute a controlled substance. *See* § 18-18-405(1)(a), (2)(a)(I)(B), (2)(c)(I), C.R.S. 2025.

¶ 7 Before trial, Alarcon moved to suppress the drug evidence obtained during the traffic stop, arguing that officers did not have reasonable articulable suspicion to justify stopping Alarcon's SUV and detaining its passengers. The trial court denied the motion, and the evidence was admitted at trial. The prosecution also introduced evidence at trial that Alarcon had previously sold meth and fentanyl. Ultimately, the jury found Alarcon guilty as charged, and he was convicted and sentenced to concurrent sentences of

3

twelve years on the first count and six years on the second count in the custody of the Department of Corrections.

¶ 8    Alarcon now appeals.

## II.    Analysis

¶ 9    Alarcon contends that (1) the trial court erred when it denied his motion to suppress because police officers did not have reasonable suspicion to conduct an investigatory stop; (2) his prior statements and text messages were admitted in violation of CRE 404(b) and CRE 403; and (3) Deputy Ryan's testimony usurped the function of the jury when he opined on Alarcon's likelihood of guilt. We see no basis for reversal.

### A.    Police Officers Had Reasonable Suspicion to Stop Alarcon's Car

¶ 10    Alarcon argues that the officers lacked reasonable suspicion to pull him over because none of the anonymous tip, Alarcon's behavior by the shed, or Moreno's behavior at the gas station constituted reasonable suspicion.

¶ 11    If a police officer has a reasonable suspicion that criminal activity is afoot, they may conduct a brief investigatory stop. *People v. Brown,* 2019 CO 63, ¶ 10.  An officer has a reasonable suspicion

4

when they "have 'a specific and articulable basis in fact for suspecting that criminal activity has occurred, is taking place, or is about to take place.'" *Id.* (quoting *People v. Perez,* 690 P.2d 853, 855 (Colo. 1984)). To determine whether a police officer had reasonable suspicion to conduct an investigatory stop, "courts look to the totality of the circumstances, keeping in mind that '[a]n officer is entitled to draw reasonable inferences from all the circumstantial evidence.'" *Id.* at ¶ 11 (alteration in original) (quoting *People v. Threlkel,* 2019 CO 18, ¶ 20).

¶ 12     As the People point out, the Colorado Supreme Court has already evaluated whether there was reasonable suspicion for the stop challenged here. In *People v. Moreno,* 2022 CO 19, the prosecution also charged Moreno, Alarcon's nephew, with intent to distribute the controlled substances found during the stop of Alarcon's car. *Id.* at ¶ 8. Moreno moved to suppress the evidence of the meth and fentanyl found in the backpack, and the trial court granted the motion. *Id.* at ¶¶ 8-9. The People then filed an interlocutory appeal to the supreme court, which ultimately reversed the trial court's suppression order.

¶ 13    The supreme court held that "under the totality of the circumstances, the officers had reasonable suspicion to conduct the stop." *Id.* at ¶ 1. First, the court stated that the original tip about Alarcon and Sewolt may have been "problematic" because it was stale at three months old. *Id.* at ¶ 19. The court noted that while that fact is "certainly a factor, it is not dispositive; instead, the totality of the circumstances must be considered." *Id.* (quoting *People v. Brown,* 2019 CO 63, ¶ 13). The court then detailed the factors supporting the officer's suspicion: the detailed nature of the tip, Moreno's and Alarcon's "strange" and "hypervigilant" behavior while at Alarcon's home, and Moreno's continued strange behavior at the gas station. *Id.* at ¶¶ 20-21.

¶ 14    Alarcon argues that none of these facts, considered individually, amount to reasonable suspicion. And the supreme court agreed with that point in *Moreno.* *Id.* at ¶ 23 ("[A]ny one of these facts by itself would be insufficient to give rise to reasonable suspicion."). But as it also noted, courts must determine whether reasonable suspicion exists based on the totality of the circumstances, not individual facts in isolation. *Id.* at ¶ 15. After considering the totality of the circumstances, the supreme court

concluded that the facts discussed above "established reasonable suspicion" to conduct an investigatory stop. *Id.* at ¶ 23.

¶ 15  In spite of this holding, Alarcon argues that we should reach a different conclusion when we evaluate the stop. In support, he asserts that in *Moreno* the supreme court relied on Moreno's actions after he left Alarcon's house. He argues that, in this case, we should consider only Alarcon's actions. Finally, he asserts that once we exclude Moreno's actions, "the totality of the circumstances here could not establish reasonable suspicion to stop Alarcon's car and detain him."

¶ 16  But only one stop is challenged in both cases. And the question before the supreme court in *Moreno* was whether officers had reasonable suspicion to stop *Alarcon's* car. *See id.* at ¶ 7 ("The second officer in the patrol car then stopped [Alarcon's] SUV on suspicion of drug trafficking activity."). In reaching its conclusion in that case, the supreme court didn't rely on facts that only involved Moreno. To the contrary, several of the key facts underpinning its decision directly involved Alarcon, including the detailed and corroborated tip and his interaction with Moreno at his house. So in considering the totality of the circumstances justifying

the stop of Alarcon's SUV, the supreme court relied on Alarcon's behavior and his interactions with Moreno, *as well as* Moreno's later suspicious behavior.

¶ 17     We also don't agree with the premise of Alarcon's argument that we should exclude Moreno's behavior when considering the totality of the circumstances around the stop and subsequent detention.  Moreno's behavior at the gas station was relevant to the challenged traffic stop.  But even if we only considered the tip about Alarcon and Sewolt, Alarcon's interaction with Moreno at the house, and their later interaction at the gas station, we would conclude that there was reasonable suspicion to stop the car and temporarily detain Alarcon and Moreno.

¶ 18     Consequently, whether we were to treat the supreme court's decision in *Moreno* as binding precedent, *see People v. Allen,* 111 P.3d 518, 520 (Colo. App. 2004), or persuasive in light of Alarcon's different factual arguments, we would reach the same conclusion. We perceive no error in the trial court's denial of Alarcon's motion to suppress.

## B. Alarcon's Prior Statements and Text Messages Did Not Violate Rule 404(b) and Rule 403

¶ 19    Alarcon next argues that the trial court erred when it admitted his prior statements and text messages about past drug activity. He claims that admitting the evidence violated Rule 404(b) and *People v. Spoto,* 795 P.2d 1314, 1318 (Colo. 1990). Alarcon also claims that the prosecutor engaged in misconduct by mentioning this evidence during closing arguments. We disagree.

### 1. Applicable Law and Standard of Review

¶ 20    Rule 404(b)(1) prohibits admitting "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." However, this type of evidence can be admitted for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." CRE 404(b)(2). To determine if prior act evidence can be admitted under one of these exceptions, courts apply a four-part *Spoto* analysis. *Spoto,* 795 P.2d at 1318.

¶ 21    First, we must determine whether the evidence "relates to a material fact." *Id.* Second, if the evidence relates to a material fact,

we then ask whether the evidence is "logically relevant, i.e., does it have 'any tendency to make the existence of [the material fact] more probable or less probable.'" *Id.* (quoting CRE 401) (alteration in original). Third, "[i]f the evidence is logically relevant, we then must determine whether the logical relevance is independent of the" bad character inference prohibited under Rule 404(b). *Id.* Fourth, we evaluate "whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice," which would violate Rule 403. *Id.*

¶ 22 We review evidentiary rulings for an abuse of discretion. *People v. Quillen,* 2023 COA 22M, ¶ 14. A court abuses its discretion when "its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law." *Id.*

¶ 23 Alarcon does not challenge the first two prongs, so we focus on prongs three and four of *Spoto.*

### 2. Additional Background

¶ 24 At trial, the prosecution introduced a number of text message exchanges extracted from a cell phone Alarcon possessed at the time of his arrest. These text messages suggested that Alarcon was buying and selling meth and fentanyl. The prosecution also

introduced statements that Alarcon made to Deputy Ryan when he was interviewed after his arrest. Alarcon said that he had (1) traded a vehicle for $6,000 worth of meth a few months before the arrest and (2) received about three pounds of meth in the trade.

### 3. The Logical Relevance of Past Drug Distribution Is Independent of the Bad Character Inference Prohibited Under Rule 404(b)

¶ 25    Alarcon argues that admitting this evidence violated the third prong of *Spoto* because it was relevant only to establish his bad character and allowed the jury to infer that he committed the charged offenses here because he acted in conformity with that bad character. We disagree.

¶ 26    The evidence consisted of statements that Alarcon had purchased or traded for meth in the past, and the text messages suggested that Alarcon had previously sold meth and fentanyl in the months leading up to the charges. The trial court concluded that this evidence was relevant to show Alarcon's intent to distribute the drugs. This theory of relevance is independent of the prohibited bad character inference. In other words, the jury did not have to rely on the inference that Alarcon committed a bad act on this occasion because he had committed a bad act on a prior

11

occasion. Instead, the jury could evaluate the evidence that he had previously sold drugs to decide whether he intended to sell the drugs he was caught with on this occasion. This theory of relevance is independent of the prohibited character inference and satisfies prong three. *See People v. Salyer,* 80 P.3d 831, 838 (Colo. App. 2003) ("[E]vidence of defendant's prior drug dealing qualified for admission because it tended to show, apart from any prohibited inference of bad character, that defendant possessed the marijuana recovered by the sheriff's officers with [the] intent to distribute it.").[1] We therefore perceive no abuse of discretion in the trial court's ruling.

### 4. The Probative Value of the Prior Statements and Text Messages Was Not Outweighed by the Danger of Unfair Prejudice

¶ 27 Alarcon argues that the evidence fails to satisfy the fourth prong of *Spoto* because "[t]he very nature of the statements and text

---

[1] Alarcon argues that *People v. Salyer,* 80 P.3d 831, 838 (Colo. App. 2003), differs from the case at hand because the CRE 404(b) issue in *Salyer* was unpreserved. We note that, as Alarcon acknowledges, the division in *Salyer* didn't find "error, much less plain error," when resolving the case. *Id.* The evidence of prior drug dealing in *Salyer* was admissible and relevant to prove intent, "apart from any prohibited inference of bad character." *Id.*

messages [were] inflammatory and likely incited the jury to convict Alarcon on an improper basis . . . because of the nature of the substances referenced[:] meth and fentanyl."  We are not convinced.

¶ 28     "Evidence is unfairly prejudicial if it has 'some undue tendency to suggest a decision on an improper basis, commonly an emotional basis, such as bias, sympathy, hatred, contempt, retribution, or horror.'"  *People v. Gonzales,* 2019 COA 30, ¶ 34 (quoting *People v. Cardenas,* 2014 COA 35, ¶ 52), *aff'd,* 2020 CO 71.  Rule "403 'strongly favors the admission of relevant evidence.'"  *People v. Schnorenberg,* 2025 CO 43, ¶ 42 (quoting *People v. Greenlee,* 200 P.3d 363, 367 (Colo. 2009)).  "Accordingly, a reviewing court must afford the evidence its maximum probative value and minimum prejudicial effect."  *Id.*  "Evidence is not unfairly prejudicial 'simply because it damages the defendant's case.'"  *People v. Dominguez,* 2019 COA 78, ¶ 30 (quoting *People v. Dist. Ct.,* 785 P.2d 141, 147 (Colo. 1990)).

¶ 29     While meth and fentanyl may elicit a negative or "inflammatory" reaction, Alarcon does not explain how these potentially damaging qualities make the evidence of past distribution *unfairly* prejudicial.  This is particularly true given that

13

the jury heard testimony about how Alarcon was found in possession of a pound of meth and about 100 fentanyl pills. Given these facts, we don't see — and Alarcon doesn't explain — how the evidence that he had previously dealt these two drugs was unfairly prejudicial. Accordingly, the trial court didn't err by concluding that the probative value of Alarcon's prior statements and text messages about past drug distribution was not outweighed by the danger of unfair prejudice.

### 5. The Prosecution Did Not Engage in Prosecutorial Misconduct

¶ 30 In his opening brief, Alarcon contends that the prosecution engaged in misconduct because the prosecutor used Alarcon's prior statements and text messages to make propensity arguments during closing arguments. In his reply brief, Alarcon clarifies that this alleged prosecutorial misconduct exacerbated the impact of the error in admitting the evidence, rendering its admission not harmless. But because we hold that the trial court did not err by admitting the evidence in the first place, we conclude there is no harm to analyze.

14

¶ 31    To the extent that Alarcon intended to argue that the prosecutor's alleged misconduct in closing argument independently entitles him to relief, we conclude that this argument is underdeveloped.  Alarcon does not identify any prosecutorial misconduct legal standards, let alone explain how those standards apply here.  We therefore decline to address that contention further.  *See People v. Wallin,* 167 P.3d 183, 187 (Colo. App. 2007) (declining to address arguments presented in a perfunctory or conclusory manner).

C.    Deputy Ryan's Testimony Does Not Require Reversal

¶ 32    Finally, Alarcon argues that the trial court erred when it admitted certain expert testimony from Deputy Ryan.  Alarcon argues that Deputy Ryan's statements usurped the function of the jury because he weighed the evidence in the case and testified that Alarcon was likely guilty of possession with intent to distribute.

1.    Applicable Law and Standard of Review

¶ 33    Testimony that merely "embraces an ultimate issue" is not objectionable, however, "an expert witness can't tell the jury what result to reach or form conclusions for the jurors that they are competent to reach on their own."  *People v. Baker,* 2019 COA 165,

¶ 14, *aff'd*, 2021 CO 29. For example, an expert cannot opine on and weigh the evidence in the case, as this is a matter "for the jury alone." *Id.* at ¶ 16.

¶ 34     We consider "a number of factors when determining whether [an] expert['s] testimony usurped the function of the jury." *People v. Rector,* 248 P.3d 1196, 1202 (Colo. 2011). These factors include whether "the testimony was clarified on cross-examination, . . . whether the expert's testimony expressed an opinion of the applicable law or legal standards thereby usurping the function of the court, . . . whether [the] jury was properly instructed on the law and that it may accept or reject the expert's opinion[, and] . . . whether an expert opined that the defendant committed the crime or that there was a particular likelihood that the defendant committed the crime." *Id.* at 1203 (citations omitted).

¶ 35     Though we review evidentiary rulings for an abuse of discretion, *Quillen,* ¶ 14, if the issue is "not preserved by objection[,]" we will only reverse if there was plain error, *Hagos v. People,* 2012 CO 63, ¶ 14. "Plain error is obvious and substantial[,] . . . [and] permit[s] an appellate court to correct 'particularly egregious errors.'" *Hagos,* ¶ 14 (quoting *Wilson v. People,* 743 P.2d

415, 420 (Colo. 1987)).  To rise to the level of plain error, the error "must be so clear-cut, so obvious, that a trial judge should be able to avoid it without the benefit of objection."  *People v. Pollard*, 2013 COA 31M, ¶ 39.  An error is ordinarily this obvious if it violates "(1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law."  *Scott v. People*, 2017 CO 16, ¶ 16 (quoting *Pollard*, ¶ 40).  An error is substantial, warranting reversal, "only if [it] 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'"  *Hagos*, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

### 2.    Deputy Ryan's Testimony About the Text Messages

¶ 36    Alarcon challenges Deputy Ryan's answers to a series of questions about the text messages on Alarcon's phone indicating he was selling drugs:

> [Prosecutor]: In your experience and review of the text messages, do these messages support that Mr. Alarcon had the opportunity to distribute controlled substances in April of 2021?
>
> [Defense Counsel]: Objection to foundation.
>
> THE COURT: Overruled.  I'll allow that.

17

DEPUTY RYAN: Yes. The text messages support that.

. . . .

[Prosecutor]: [I]n your expert opinion, do these messages provide evidence that Mr. Alarcon had the knowledge to distribute controlled substances in April of 2021?

DEPUTY RYAN: Yes, they do.

[Prosecutor]: In your expert review of these messages, do these messages provide evidence that in April 2021 Mr. Alarcon did not possess these drugs by accident?

DEPUTY RYAN: Yes. In my expert review of the messages, I reach a conclusion it appears the user of this phone was both seeking[,] purchasing[,] and distributing controlled substances.

[Prosecutor]: Based on your experience in drug distribution investigations, do these te[x]t messages provide evidence that proves that Mr. Alarcon had the intent to sell or distribute controlled substances in April 2021?

DEPUTY RYAN: Yes.

¶ 37    Most of these questions are not problematic. In them, the prosecutor asked whether the text messages supported or provided evidence that Alarcon had knowledge, opportunity, or intent to possess and distribute controlled substances. These are all appropriate subjects for expert testimony.

18

¶ 38     But as noted above, an expert witness cannot opine on and weigh the evidence in a case. *Baker,* ¶ 16. The last two questions in this series run afoul of this rule. Deputy Ryan testified that he had concluded that Alarcon *was* seeking, purchasing, and distributing controlled substances. And Deputy Ryan responded affirmatively when the prosecutor asked if the text messages *proved* that Alarcon had the intent to distribute drugs. In giving these answers, Deputy Ryan weighed the evidence of the text messages and opined that it proved intent.

¶ 39     But even if this testimony was inadmissible, we conclude that any error wasn't "so clear-cut, so obvious, that a competent trial judge should [have been] able to avoid it without [the] benefit of [an] objection." *People v. Beilke,* 232 P.3d 146, 152 (Colo. App. 2009). The two questions occurred near the middle of sixty-eight transcript pages of Deputy Ryan's testimony. As noted, they occurred in a series of questions that neither called for nor contained inappropriate testimony. During Deputy Ryan's testimony, defense counsel actively and frequently objected to questions or resulting answers, including the questions immediately surrounding the ones Alarcon challenges on appeal. And the trial court sustained many

of those objections. Yet defense counsel did not object to these two questions. And even if we didn't reach this conclusion, this testimony was, at least in part, cumulative of other witness testimony. Given all of these facts, we don't perceive these two questions as "cast[ing] serious doubt on the reliability of the judgment of conviction." *See Pollard*, ¶ 43 (quoting *Hagos*, ¶ 14). We therefore conclude that the trial court did not plainly err by not sua sponte striking the answers to these two questions.

### 3. Deputy Ryan's Testimony About the Amount of Drugs

¶ 40 Deputy Ryan also testified that Alarcon "had been in a vehicle with a significant amount of controlled substances, an amount of controlled substances that [Deputy Ryan] suspected, based on [his] training and experience, to be only possessed for the purposes of distribution." He testified that in his experience, someone carrying around a pound of meth was inconsistent with "here-and-there usage."

¶ 41 Applying the *Rector* factors, we see no error. Deputy Ryan did not opine that Alarcon likely committed the crime because of the amount of drugs found in the car. *Rector,* 248 P.3d at 1202.

20

Instead, he merely opined that the amount of drugs Alaron possessed was inconsistent with personal use based on his years of experience. Though Deputy Ryan's testimony was not clarified on cross-examination, the jury was properly instructed. *Id.* It was told that it was "not bound by the testimony of witnesses who . . . testified as experts; the credibility of an expert's testimony [was] to be considered as that of any other witness. [And the jury was allowed to] . . . believe all of an expert witness's testimony, part of it, or none of it." Moreover, Deputy Ryan did not opine as to the legal standard the court should apply.

¶ 42 Considering the *Rector* factors, we conclude that Deputy Ryan did not usurp the function of the jury. The trial court did not err by not sua sponte excluding this testimony.

### III. Disposition

¶ 43 The judgment of conviction is affirmed.

JUDGE FOX and JUDGE SULLIVAN concur.