The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
September 9, 2021

## 2021COA120

**No. 18CA0488, *People v. Draper* — Crimes — Murder in the First Degree — Extreme Indifference — Universal Malice**

Disagreeing with *People v. Garcia*, 2020 COA 80, a division of the court of appeals holds that in a prosecution for extreme indifference murder a trial court is required to give a jury instruction defining "universal malice" in a manner consistent with the supreme court's definition of the term in *Candelaria v. People*, 148 P.3d 178 (Colo. 2006).

COLORADO COURT OF APPEALS                                    **2021COA120**

Court of Appeals No. 18CA0488
Arapahoe County District Court Nos. 16CR2517 & 16CR3337
Honorable Ben L. Leutwyler III, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

James Anthony Draper,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE BERGER
Richman and Welling, JJ., concur

Announced September 9, 2021

Philip J. Weiser, Attorney General, Brock J. Swanson, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Antony Noble, Alternate Defense Counsel, Taylor Ivy, Alternate Defense
Counsel, Lakewood, Colorado, for Defendant-Appellant

¶ 1    This case requires us to decide whether the trial court erred by failing to instruct the jury on the definition of "universal malice," an element of first degree extreme indifference murder.  *See* § 18-3-102(1)(d), C.R.S. 2020.  Disagreeing with another division of this court, we conclude that the trial court erred by failing to define that term.

¶ 2    Defendant, James Anthony Draper, appeals multiple convictions, including three counts of attempted extreme indifference murder.  Draper claims that the following alleged errors require either the reversal or vacation of his convictions:

- instructional error;

- violations of the Uniform Mandatory Disposition of Detainers Act (UMDDA), sections 16-14-101 to -108, C.R.S. 2020;

- improper consolidation;

- the admission of inadmissible evidence at trial; and

- unconstitutional convictions for attempted extreme indifference murder.

While we agree that the court erred by not instructing the jury on the definition of "universal malice," we conclude that this error was

constitutionally harmless. Because we reject Draper's other claims of error, we affirm his convictions.

## I. Relevant Facts and Procedural History

¶ 3 Evidence admitted at trial permitted the jury to find the following facts. Draper repeatedly told his wife, A.D., that if she ever cheated on him, he would kill her. On at least one occasion, A.D. told Draper that she had cheated on him.

¶ 4 Witnesses testified that about a week before A.D. was murdered, Draper and A.D. argued about A.D.'s affair. A.D.'s friends testified that A.D. told them that she believed Draper was going to kill her and that she wanted to leave the relationship but did not know how to do so. A day or two before A.D. was murdered, Draper called the man with whom A.D. had the affair and demanded details of the sexual conduct.

¶ 5 Then, one morning, the police found A.D. in her apartment and discovered that she had been shot twice, once in the back of the head and once in the chest. A forensic pathologist testified that the bullet to her chest was a lethal injury.

¶ 6 The next morning, Draper, brandishing a gun, approached a car and ordered the occupants to get out. While driving that car,

Draper shot at other occupied cars, hitting at least three. The police pursued Draper. During that chase, Draper pointed his gun directly at no fewer than three police officers.

¶ 7     The incident ended when an officer crashed his vehicle into the car Draper was driving. On his arrest, Draper asked the officers why they had not killed him. During the search incident to arrest, the police found cocaine in Draper's pocket. In the car, the police found two guns, one of which an expert testified at trial was the gun used to murder A.D.

¶ 8     In the first filed case, based on the events that occurred after A.D.'s murder, the prosecution charged Draper with six counts of attempted extreme indifference murder; three counts of first degree assault; aggravated robbery; aggravated motor vehicle theft; felony menacing; vehicular eluding; and possession of a controlled substance.[1]

---

[1] The prosecution dismissed two attempted extreme indifference murder counts. As a result, the jury considered four attempted extreme indifference murder counts.

¶ 9    In a later filed case, the prosecution charged Draper with the first degree murder of A.D.  Over Draper's objection, the trial court consolidated the two cases for trial.

¶ 10    Draper's theory of the case was that he did not kill A.D.; instead she was murdered by some unidentified person.  In his attempt to explain or mitigate his conduct shortly after A.D.'s murder, Draper claimed he was distraught when he learned about A.D.'s death and he tried to commit "suicide by cop" without any intent to harm anyone else.

¶ 11    The jury found Draper guilty of three counts of attempted extreme indifference murder; the lesser included offense of attempted reckless manslaughter; three counts of the lesser nonincluded offense of felony menacing; aggravated robbery; aggravated motor vehicle theft; felony menacing; vehicular eluding; possession of a controlled substance by a special offender; and the lesser nonincluded offense of illegal discharge of a firearm.  The jury acquitted Draper of one count of attempted extreme indifference murder and the three counts of first degree assault.  The trial court sentenced Draper to a total of 400 years in prison for these convictions.

¶ 12    The jury also found Draper guilty of second degree murder for the murder of A.D. but acquitted him of first degree murder. The trial court adjudicated Draper a habitual criminal and imposed a concurrent sentence of ninety-six years in prison.

## II.    Jury Instructions

¶ 13    We first address Draper's contentions of instructional error.

### A.    The Trial Court Did Not Abuse its Discretion by Denying Draper's Request to Instruct the Jury on Certain Lesser Included Offenses

¶ 14    Draper's counsel asked the court to instruct the jury on a number of lesser included offenses. As to the murder of A.D., the court agreed in part, instructing the jury on second degree murder. But the court refused to instruct the jury on manslaughter and criminally negligent homicide, finding that there was no rational basis on which the jury could acquit Draper of the greater offenses but convict him of those lesser offenses.

¶ 15    As to the attempted extreme indifference murder counts, Draper's counsel requested that the jury be instructed on the lesser included offenses of attempted manslaughter and attempted criminally negligent homicide. The trial court instructed the jury on

5

attempted manslaughter but denied an instruction on attempted criminally negligent homicide.

### 1.    Standard of Review

¶ 16    We review a trial court's refusal to instruct the jury on lesser included offenses for an abuse of discretion. *People v. Buell*, 2017 COA 148, ¶ 31, *aff'd*, 2019 CO 27.  A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. *People v. Baker*, 2021 CO 29, ¶ 29.  "A trial court is only required to give a lesser included offense instruction when there is 'a rational basis in the evidence to support a verdict acquitting him of a greater offense . . . and convicting him of the lesser offense.'"  *Buell*, ¶ 31 (quoting *People v. Bartowsheski*, 661 P.2d 235, 242 (Colo. 1983)).

### 2.    Application

¶ 17    As relevant here, a person commits first degree murder when, "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person . . . ." § 18-3-102(1)(a).  A person commits second degree murder when that "person knowingly causes the death of a person." § 18-3-103(1), C.R.S. 2020.  A person commits the crime of

6

manslaughter if he "recklessly causes the death of another person." § 18-3-104(1)(a), C.R.S. 2020. "Any person who causes the death of another person by conduct amounting to criminal negligence commits criminally negligent homicide." § 18-3-105, C.R.S. 2020.

¶ 18    The court refused to instruct the jury on manslaughter and criminally negligent homicide because there was no evidence that, if Draper committed the criminal act, his culpable mental state could have been anything other than intentional or knowing.

¶ 19    Draper defended against the charge of first degree murder by claiming that he did not kill A.D. No evidence suggested that A.D.'s death was the result of an accident or resulted from Draper consciously disregarding a substantial and unjustifiable risk that A.D. would be killed. The circumstances of the shooting — two potentially lethal gunshot wounds — simply made it impossible for a reasonable jury to find a culpable mental state other than intentional or knowing. Therefore, the court did not abuse its discretion by denying Draper's request to instruct the jury on manslaughter and criminally negligent homicide.

¶ 20    Similarly, regarding Draper's rampage, the trial court did not abuse its discretion by refusing to instruct the jury on attempted

criminally negligent homicide. A person commits attempted manslaughter by taking a substantial step toward recklessly causing the death of another. § 18-2-101(1), C.R.S. 2020; § 18-3-104(1)(a). A person commits attempted criminally negligent homicide by taking a substantial step toward "caus[ing] the death of another person by conduct amounting to criminal negligence."[2] §§ 18-3-105, 18-2-101(1). The distinction between a reckless and criminally negligent mental state is whether the defendant was aware of the risk posed by his actions. § 18-1-501(3), (8), C.R.S. 2020.

¶ 21 Draper fired shots and hit at least three occupied vehicles. It simply defies logic to conclude that he did so with criminal negligence. By Draper's own theory of defense — that he shot at other cars in an effort to commit "suicide by cop" — Draper acknowledged that he acted at least knowingly. Under these circumstances, the contention that Draper negligently fired a gun multiple times at numerous persons or was unaware of the risk of doing so borders on the frivolous. Accordingly, the trial court

---

[2] We express no opinion as to whether attempted criminally negligent homicide is a cognizable offense.

8

correctly rejected an instruction on attempted criminally negligent homicide.

### B. The Trial Court Correctly Refused to Instruct the Jury that Voluntary Intoxication Was a Defense to the Attempted Extreme Indifference Murder Charges

¶ 22    Draper next argues that the trial court erred by refusing to instruct the jury that it could consider evidence of his voluntary intoxication when determining whether he acted with extreme indifference and universal malice, both elements of attempted extreme indifference murder.

¶ 23    Section 18-1-804(1), C.R.S. 2020, provides that evidence of voluntary intoxication is relevant and admissible for only one purpose: "to negative the existence of a specific intent if such intent is an element of the crime charged." *See People v. Zekany*, 833 P.2d 774, 778 (Colo. App. 1991). The General Assembly has declared all offenses with a mental state of "intentionally" to be specific intent offenses. § 18-1-501(5).

¶ 24    Attempted extreme indifference murder is not a specific intent crime; instead, it requires that the defendant have the general intent to act knowingly. *See* § 18-3-102(1)(d); *see also* § 18-2-101(1); *Zekany*, 833 P.2d at 778. Draper argues that the

9

court in *People v. Jefferson*, 748 P.2d 1223, 1233-34 (Colo. 1988), held that extreme indifference murder requires a heightened mental culpability beyond knowing. This is a misreading of *Jefferson*. *Jefferson* upheld the constitutionality of the extreme indifference murder statute against an equal protection challenge, in spite of the fact that both second degree murder and extreme indifference murder require a mental state of knowingly, because "[a] more specific actus reus [was] sufficient to distinguish" the two offenses. *Id.* at 1233. Accordingly, specific intent is not an element of attempted extreme indifference murder, and, by statute, the defense of voluntary intoxication is unavailable. The trial court correctly denied Draper's request.

### C. Universal Malice

¶ 25     Draper argues that the trial court reversibly erred by refusing to define universal malice.

1. The Trial Court Did Not Abuse its Discretion by Refusing to Give Draper's Proposed Definition of Universal Malice

¶ 26     Defense counsel tendered a definitional instruction on universal malice:

> "Universal malice" means that depravity of the
> human heart, which determines to take life

> upon slight or insufficient provocation, without knowing or caring who may be the victim.

The prosecutor objected, stating that case law "does not require a definition and there is no definition of universal malice." Defense counsel further argued: "there has to be a definition of universal malice." The trial court rejected the tendered instruction and declined to otherwise instruct the jury on the meaning of universal malice.[3]

¶ 27    A trial court has a duty to correctly instruct the jury on all matters of law. *People v. Espinosa*, 2020 COA 63, ¶ 8. We review de novo whether jury instructions accurately informed the jury of the relevant governing law. *People v. Carbajal*, 2014 CO 60, ¶ 10. A trial court has substantial discretion in formulating jury instructions if "they are correct statements of the law and fairly and adequately cover the issues presented." *People v. Nerud*, 2015 COA

---

[3] The trial court rejected the tendered instruction based on the principle from *Evans v. People* that "a trial court's use of an excerpt from an opinion in an instruction is generally an unwise practice." 706 P.2d 795, 800 (Colo. 1985). As the supreme court explained in *Evans*, judicial "opinions and [jury] instructions have very different purposes." *Id.* However, when the supreme court, in one of its opinions, defines a statutory term (like universal malice), lower courts must apply the law stated by the supreme court. That does not constitute an improper use of an excerpt from an opinion.

27, ¶ 35 (citation omitted). Thus, we review a trial court's decision to give, or not to give, a particular jury instruction for an abuse of discretion. *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011).

¶ 28    Over a century ago, the Colorado Supreme Court described universal malice as the "depravity of the human heart, which determines to take life upon slight or insufficient provocation, without knowing or caring who may be the victim." *Longinotti v. People*, 46 Colo. 173, 180-81, 102 P. 165, 168 (1909). This definition was quoted with approval in *Jefferson*, 748 P.2d at 1228.

¶ 29    Most recently, however, the Colorado Supreme Court has described universal malice as "conduct that, by its very nature and the circumstances of its commission, evidences a willingness to take human life indiscriminately, without knowing or caring who the victim may be or without having an understandable motive or provocation."[4] *Candelaria v. People*, 148 P.3d 178, 181 (Colo.

---

[4] We rely on the supreme court's definition of universal malice in *Candelaria v. People*, 148 P.3d 178, 181 (Colo. 2006), because the supreme court in *People v. Anderson*, 2019 CO 34, ¶ 15, relied on the *Candelaria* definition. *Anderson* does not purport to change the *Candelaria* definition of universal malice. In addition, unlike *Candelaria*, the issue presented in *Anderson* was not the definition of universal malice.

2006).  This most recent definition of universal malice no longer includes any reference to the "depravity of the human heart."

¶ 30   The supreme court is the ultimate arbiter of state law and when it defines a statutory term, lower courts must apply that definition.  *See In re Estate of Ramstetter*, 2016 COA 81, ¶ 40. Defense counsel's tendered definition of universal malice was not a correct statement of the law because it did not accurately reflect the supreme court's most recent definition of universal malice.  "A trial court may refuse an instruction that contains an incorrect statement of law."  *People v. Tweedy*, 126 P.3d 303, 307 (Colo. App. 2005).  Therefore, the trial court did not abuse its discretion by refusing the tendered instruction.

2.   The Trial Court Erred by Not Defining Universal Malice

¶ 31   Draper also contends that the trial court erred by failing to define universal malice.  We agree with this contention.

¶ 32   In addition to tendering his definition of universal malice, defense counsel argued that "there has to be some definition of universal malice," citing both *Jefferson* and *Candelaria.*  Even though Draper's tendered instruction incorrectly stated the law, the tendered instruction as well as his argument that "there has to be a

13

definition of universal malice" put the trial court on notice of Draper's request that the jury be given a correct definition of universal malice. *See People v. Garcia*, 28 P.3d 340, 349 n.8 (Colo. 2001). Accordingly, this issue was preserved.

¶ 33 A definitional instruction is not required when an elemental term is "one with which reasonable persons of common intelligence would be familiar, and its meaning is not so technical or mysterious as to create confusion in jurors' minds as to its meaning." *People v. Deadmond*, 683 P.2d 763, 769 (Colo. 1984), *superseded by statute*, Ch. 140, sec. 1, § 16-11-204.5(4), 1985 Colo. Sess. Laws 630. Conversely, words and phrases "that have acquired a technical or particular meaning, whether by legislative definition or otherwise," must be defined for the jury. § 2-4-101, C.R.S. 2020; *see Griego v. People*, 19 P.3d 1, 7 (Colo. 2001).

¶ 34 A division of this court recently held that the ordinary meaning of universal malice is an "unrestricted willingness to do harm without sufficient justification." *People v. Garcia*, 2021 COA 80, ¶ 18. The *Garcia* division discerned this meaning by combining the dictionary definitions of "universal" — defined as "including or covering all or a whole collectively or distributively without limit or

14

notable exception or variation" or "relatively unrestricted in application," *id.* (quoting Webster's Third New International Dictionary 2501 (2002)) — and "malice" — defined as an "intention or desire to harm another usu[ally] seriously through doing something unlawful or otherwise unjustified," *id.* (quoting Webster's Third New International Dictionary at 1366).

¶ 35    When a statute uses a term with which reasonable persons of common intelligence would be familiar, it makes sense for courts to consult recognized dictionaries to aid in determining that ordinary meaning or understanding. *Griego*, 19 P.3d at 9 (turning to the dictionary for the ordinary meaning of "knowledge"); *People v. Cardenas*, 2014 COA 35, ¶ 25 ("The ordinary meaning of the verbs 'sell,' 'exchange,' 'barter,' and 'lease' involves the transfer of a right of ownership or possession."); *People v. Coahran*, 2019 COA 6, ¶ 25 (looking to the dictionary for the ordinary meaning of "upon"). But when courts define complex legal concepts or constructs by consultation with dictionaries and then do not instruct jurors on the derived definition, problems arise, as this case well illustrates. We conclude that the term "universal malice" does not have a common meaning or understanding.

15

¶ 36　The practice of defining complex legal concepts by consultation with dictionaries is even more problematic because, while the appellate judges in *Garcia* had access to one or more dictionaries to accomplish this task, the jury has no such resources.  Indeed, the Colorado Supreme Court in *Alvarez v. People*, 653 P.2d 1127, 1131 (Colo. 1982), held that "a juror's consultation of a dictionary to assist in understanding legal terminology in the court's instructions [was] improper."

¶ 37　More importantly, even assuming that universal malice has a common meaning, the *Garcia* definition is not consistent with the supreme court's definition of the term.  As noted, the supreme court most recently defined universal malice as "conduct that, by its very nature and the circumstances of its commission, evidences a willingness to take human life indiscriminately, without knowing or caring who the victim may be or without having an understandable motive or provocation."  *Candelaria,* 148 P.3d at 181.

¶ 38　Unlike the supreme court's definition, the definition derived by the *Garcia* division does not require a "willingness to take human life indiscriminately" or doing so "without knowing or caring who the victim may be."  These are critical subelements of the legal

16

definition of universal malice, an essential element of the crime of extreme indifference murder that distinguishes it from other offenses.[5]

¶ 39    For these reasons, we disagree with the analysis and holding of *Garcia* and decline to apply it here.  Instead, we conclude that the trial court erred in not instructing the jury on the definition of universal malice consistent with the supreme court's definition in *Candelaria.*

        3.    The Error was Harmless Beyond a Reasonable Doubt

¶ 40    The omission of an element (and by extension the lesser error of failing to define an element) of an offense in the jury instructions can be harmless beyond a reasonable doubt if the evidence relating to that element is overwhelming.  *See Neder v. United States*, 527 U.S. 1, 16-17 (1999); *Key v. People*, 715 P.2d 319, 323 (Colo. 1986).

¶ 41    That is the case here.  In *Montoya v. People*, the supreme court described "consciously but indiscriminately shooting into a crowd of

---

[5] Indeed, *Anderson* recently reiterated and emphasized the "willingness to take [human] life indiscriminately" language from *Candelaria.  Anderson,* ¶ 15.

people" as the "quintessential example" of extreme indifference murder. 2017 CO 40, ¶ 21.

¶ 42 Draper's conduct of indiscriminately shooting at various occupied and unoccupied vehicles is virtually indistinguishable from the supreme court's "quintessential example." "[B]y its very nature and the circumstances of its commission, [Draper's conduct] evidence[d] a willingness to take human life indiscriminately, without knowing or caring who the victim may be or without having an understandable motive or provocation." *Candelaria*, 148 P.3d at 181.

¶ 43 Because the evidence that Draper acted with universal malice, as defined by the supreme court, was overwhelming, the trial court's failure to define universal malice for the jury was harmless beyond a reasonable doubt.

### III. UMDDA

¶ 44 Draper next contends that the prison superintendent's failure to promptly inform him of his rights under the UMDDA requires that all his charges be dismissed or, alternatively, that a hearing be held on his UMDDA claim.

## A.     Additional Facts

¶ 45     Draper was incarcerated in the custody of the Department of Corrections (DOC) on June 1, 2017, when he was resentenced to prison in an unrelated case.  The Arapahoe County Sheriff issued a no bond detainer dated June 21, 2017, for the case charging the murder of A.D.  In a pro se document filed in the court on August 18, 2017, Draper purported to invoke his UMDDA right to be tried within 182 days and claimed that the DOC superintendent failed to promptly inform him of the detainer.

¶ 46     The prosecution requested a hearing, and, because Draper was represented by counsel, the trial court ordered defense counsel to file a written response to the prosecutor's request for a hearing.  In response to the court's order, defense counsel filed a document stating that Draper was invoking his UMDDA right to a speedy disposition.  That document did *not* assert that the superintendent failed to promptly inform Draper of his UMDDA rights.  The trial court held a hearing and set the case charging the attempted extreme indifference murder counts and the case charging the murder of A.D. for trial.  The superintendent advised Draper of his

UMDDA rights in writing on September 27, 2017.  Draper's trial began on January 2, 2018.

## B.    Applicable Law

¶ 47    Section 16-14-102(2), C.R.S. 2020, provides as follows:

> It is the duty of the superintendent of the institution where the prisoner is confined to promptly inform each prisoner, in writing, of the source and nature of any untried indictment, information, or criminal complaint against him of which the superintendent has knowledge . . . .

¶ 48    "[T]he superintendent only has 'knowledge' of untried charges when a detainer has been filed." *People v. Yellen*, 704 P.2d 306, 310 (Colo. 1985).  A prisoner may request in writing a final disposition of any untried charges.  § 16-14-102(1).  The superintendent must forward this request to the court and the prosecutor, § 16-14-103(1), C.R.S. 2020, and a trial on the untried charges must begin within 182 days after receipt of the request, § 16-14-104(1), C.R.S. 2020.  If the trial does not begin within that period, the court must dismiss those charges with prejudice.  *Id.*

¶ 49    In addition,

> [f]ailure of the superintendent of the institution where the prisoner is confined to inform a prisoner, as required by subsection (2) of this

20

> section, within one year after a detainer from this state has been filed with the institution where the prisoner is confined shall entitle the prisoner to a dismissal with prejudice . . . .

§ 16-14-102(3). "Otherwise, a violation of the prompt notification requirement entitles a defendant to a dismissal of the charges *unless* the prosecution can demonstrate a lack of prejudice as a result of that violation." *People v. Glasser*, 293 P.3d 68, 76 (Colo. App. 2011) (emphasis in original) (citing *People v. Higinbotham*, 712 P.2d 993, 1001 (Colo. 1986)).

### C. Application

#### 1. Automatic Dismissal Under Section 16-14-102(3) is Not Warranted

¶ 50    Dismissal is required if the superintendent fails to inform a prisoner of a detainer within one year after the detainer has been filed with the institution where the prisoner is confined. § 16-14-102(2), (3).

¶ 51    The earliest possible date that the superintendent could have had knowledge of the detainer for the case charging the murder of A.D. was June 21, 2017, the date the Arapahoe County Sheriff issued the no bond detainer. The superintendent informed Draper of his UMDDA rights on September 27, 2017, approximately three

21

months after the date of the detainer and well less than a year after the date of the detainer. Therefore, automatic dismissal under section 16-14-102(3) is not warranted.

2. Draper is Not Entitled to Any Relief Under his Claim that the Superintendent Failed to Promptly Notify him of his UMDDA Rights

¶ 52　Draper claimed in his pro se document that "[t]he failure to promptly advise me of my detainers and/or the rights allotted me related to them has prejudiced me and requires dismissal of the related charges." But Draper was represented by counsel when he filed this document, and defense counsel never asserted that the superintendent failed to promptly inform Draper of his rights under the UMDDA.

¶ 53　A criminal defendant is not entitled to hybrid representation — self-representation and representation by counsel. *See People v. Arguello*, 772 P.2d 87, 92 (Colo. 1989). It follows that a trial court may disregard pro se filings by a represented defendant. *See, e.g., People v. Gess*, 250 P.3d 734, 737 (Colo. App. 2010). Indeed, the division in *Gess* concluded that the defendant's pro se motion was insufficient to invoke his UMDDA rights. *Id.* We apply *Gess* here

22

and conclude that Draper's pro se UMDDA document was ineffective for any purpose.

¶ 54 Even assuming that Draper's pro se document preserved this claim for review, we conclude that Draper is not entitled to any relief.

¶ 55 As discussed above, the earliest possible date that the superintendent could have had knowledge of the detainer for the case charging the murder of A.D. was June 21, 2017. Assuming Draper could have invoked his right to a speedy disposition under the UMDDA on June 21, 2017, and that the court would have received Draper's request on the very same day, the statutory deadline for Draper's trial would have been December 20, 2017 (182 days later). Draper's trial began on January 2, 2018, thirteen days after December 20, 2017.

¶ 56 The only prejudice Draper claims on appeal is a longer detention. True, the prosecution bears the burden to prove that the defendant was not prejudiced by the failure to give prompt notice. *Higinbotham*, 712 P.2d at 997-98. But Draper does not cite, nor are we aware of, any authority to support his claim that there is a

*presumption* that *any* delay in promptly notifying a defendant of his UMDDA rights is prejudicial.

¶ 57    In fact, in *Martin v. People*, 738 P.2d 789, 793 n.2 (Colo. 1987), the supreme court upheld the trial court's determination that a six-day delay was not prejudicial. There is no material difference between the six-day delay in *Martin*, and the possible thirteen-day delay in this case. Accordingly, we reject this claim.

       3.    Draper's Trial Began Within the 182-Day Deadline

¶ 58    To the extent Draper claims that the trial court did not bring him to trial within the time required by the UMDDA, the record disproves that argument. Even assuming Draper's pro se document (received by the court on August 18, 2017) invoked his right to be brought to trial within 182 days, Draper was brought to trial within the statutory timeframe. Draper's trial began on January 2, 2018, 137 days after the court received his pro se document.

¶ 59    For all of these reasons, Draper is not entitled to any relief under the UMDDA.

## IV. The Trial Court Did Not Abuse its Discretion by Consolidating Draper's Two Cases

¶ 60    Draper argues that the trial court abused its discretion by consolidating the separately filed cases involving the murder of A.D. and the charges arising from Draper's rampage.

### A.    Preservation and Standard of Review

¶ 61    A pretrial objection to consolidation is sufficient to preserve the issue for appeal. *Bondsteel v. People*, 2019 CO 26, ¶ 29. Draper objected to the prosecution's motion to consolidate. Therefore, this issue is preserved.

¶ 62    We review a trial court's decision to consolidate separate charges under Crim. P. 13 for an abuse of discretion. *Id.* at ¶ 32.

¶ 63    Crim. P. 13 provides, in pertinent part, that, "[s]ubject to the provisions of [Crim. P.] 14, the court may order two or more indictments, informations, complaints, or summons and complaints to be tried together if the offenses . . . could have been joined in a single indictment, information, complaint, or summons and complaint." "Accordingly, consolidation requires both that joinder would have been proper under Crim. P. 8(a)(2) and that the

consolidation would not result in prejudice within the meaning of Crim. P. 14." *Bondsteel*, ¶ 34.

¶ 64    Draper contends that consolidation was improper because not all of the evidence was cross-admissible (meaning admissible in each case had the cases been tried separately) and because consolidation prejudiced him. Neither argument has merit.

> B.    Joinder Would have been Proper under Crim. P. 8(a)(2)

> Crim. P. 8(a)(2) allows for the permissive joinder of two or more offenses in the same indictment or information if they are (1) "of the same or similar character"; (2) "based on two or more acts or transactions connected together"; or (3) based on two or more acts or transactions "constituting parts of a common scheme or plan."

*Buell*, 2019 CO 27, ¶ 18 (quoting Crim. P. 8(a)(2)). Transactions may be "connected together" when they involve interrelated proof. *See People v. Knight*, 167 P.3d 147, 151 (Colo. App. 2006).

¶ 65    The record supports the trial court's determination that the two cases were based on two or more acts or transactions "connected together." A.D. was murdered less than two days before Draper stole a car at gunpoint and shot at other cars indiscriminately as he drove. Firearms experts testified that one of

26

the guns Draper had with him after the police chase matched the gun that was used to murder A.D.  Both crimes occurred within about ten miles of each other.

¶ 66     In addition, most, if not all, of the evidence was cross-admissible as direct evidence of guilt, res gestae ("evidence that is closely related in both time and nature to the charged offense" *People v. Quintana,* 882 P.2d 1366, 1373 (Colo. 1994)), or under CRE 404(b).[6]  For example, evidence that Draper was distraught about the death of his wife when he stole a car from its owner at gunpoint, shot at other cars on the road, and pointed his gun at multiple police officers was directly relevant to the attempted extreme indifference murder counts as evidence of his mental state. Evidence that Draper stole a car from its owner at gunpoint less than two days after his wife was shot in the head and chest was admissible to fully explain the charged conduct to the jury as res gestae.  *Id.*  Evidence that the same gun used to kill A.D. was found

---

[6] Draper also argues that the voluminous nature of the evidence that was relevant only to one of the cases warrants reversal.  Draper does not cite, nor are we aware of, any authority holding that the volume of evidence against the defendant in each case is relevant to the joinder inquiry under Crim. P. 8(a)(2).  Accordingly, we reject this argument.

in the vehicle Draper hijacked was relevant to prove the identity of A.D.'s murderer.

¶ 67    Accordingly, joinder would have been proper under Crim. P. 8(a)(2).

### C.    Consolidation Did Not Prejudice Draper Within the Meaning of Crim. P. 14

¶ 68    To show that a trial court abused its discretion by consolidating cases, "the defendant must demonstrate that (1) the joinder caused actual prejudice, and (2) the trier of fact was unable to separate the facts and legal principles applicable to each offense." *Knight*, 167 P.3d at 151.  When evidence is cross-admissible in separate trials, there is no prejudice in consolidating the cases. *Buell*, 2017 COA 148, ¶ 16.

¶ 69    As analyzed above, most, if not all, of the evidence was cross-admissible as direct evidence of guilt, res gestae, or under CRE 404(b).  Most importantly, Draper's theory of defense — that he was distraught by the death of his wife and intended to commit "suicide by cop" when he shot at other cars and pointed his gun at police officers — eliminated any possibility of unfair prejudice.

¶ 70    Draper also failed to demonstrate that the jury was unable to separate the facts and legal principles applicable to each offense.  In *People v. Bondsteel*, 2015 COA 165, ¶ 53, *aff'd*, 2019 CO 26, the court reasoned that verdicts by which the defendant was acquitted of five charges and convicted of a lesser charge showed that the jury was able to separate the facts and legal theories involved in each offense.  *See also People v. Garcia*, 2012 COA 79, ¶¶ 29-30 (observing that a split verdict "indicates that the jury was able to separate the facts, legal principles, and defenses applicable to these charges from others").  When the jury is instructed that it must consider each charge separately from all other charges, a reviewing court must presume that the jury followed these instructions unless contrary evidence is shown.  *People v. Curtis*, 2014 COA 100, ¶ 23.

¶ 71    The jury convicted Draper of some charges and acquitted him of others.  The jury was also instructed that

> [e]ach count charges a separate and distinct offense and the evidence and the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count.  The fact that you may find Mr. Draper guilty or not guilty of one of the offenses charged, should not control your verdict as to any other offense charged against Mr. Draper.

¶ 72    Absent any evidence that the jury was unable to follow this instruction (of which there is none) or that the jury was confused by multiple counts and charges, we presume the jury followed these instructions. *Id.*

¶ 73    In sum, the trial court did not abuse its discretion by consolidating Draper's cases for trial.

## V.    Evidentiary Challenges

¶ 74    Draper contends that the trial court violated his constitutional right to confrontation and state evidence rules by admitting hearsay statements made by A.D. He also argues that the trial court admitted certain evidence in violation of CRE 404(b).

### A.    Preservation and Standard of Review

¶ 75    A claim of evidentiary error is preserved for review when an objection sufficiently alerts "the trial court to a particular issue in order to give the court an opportunity to correct any error." *People v. Pahl*, 169 P.3d 169, 183 (Colo. App. 2006).

¶ 76    "We review a trial court's evidentiary rulings for an abuse of discretion." *Campbell v. People*, 2019 CO 66, ¶ 21. A court abuses its discretion when its decision is manifestly arbitrary,

unreasonable, or unfair, or if it misapplies the law. *Baker,* ¶ 29.

Mere disagreement with the trial court's ruling does not constitute an abuse of discretion. *See People v. Shari,* 204 P.3d 453, 465 (Colo. 2009). Instead, a reviewing court must defer to the trial court's ruling so long as it falls within the range of possible outcomes. *Id.* A claim that the trial court violated the defendant's Confrontation Clause rights is reviewed de novo. *People v. Phillips,* 2012 COA 176, ¶ 85.

## B.  Confrontation Clause

¶ 77    The Federal Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Under this Amendment, testimonial hearsay must be excluded when the declarant is unavailable and there has been no prior opportunity for cross-examination by the defendant. *Crawford v. Washington,* 541 U.S. 36, 68-69 (2004). But only testimonial hearsay statements are subject to exclusion under the Confrontation Clause; nontestimonial hearsay statements are only subject to state rules of evidence. *Raile v. People,* 148 P.3d 126, 130 (Colo. 2006).

¶ 78    "[S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" are generally considered testimonial.  *Crawford*, 541 U.S. at 52.

¶ 79    The challenged statements include A.D.'s statements that Draper threatened to kill her, that she told Draper she cheated on him, and that she wanted to leave Draper but did not know how. A.D. made the challenged statements to friends and family members.  She made these statements while speaking with friends, getting her hair done, and working.  These statements were not "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.*  Accordingly, these statements were not testimonial, a determination which precludes a finding of a Confrontation Clause violation.

### C.    CRE 807

¶ 80    Draper also argues that the admission of certain hearsay statements violated state evidence rules.  He specifically contends

that the trial court erred by finding that these statements had circumstantial guarantees of trustworthiness under CRE 807.[7]

¶ 81 Hearsay is a "statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). Hearsay isn't admissible unless an exception applies. CRE 802, 803, 804, 807. CRE 807 provides, in pertinent part, that

> [a] statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

¶ 82 "In considering the trustworthiness of a statement, courts should examine the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant

---

[7] With one possible exception (relating to a discussion about abortion), Draper does not contend that these hearsay statements were irrelevant.

in making the statement, and the circumstances under which the statement was made." *People v. Jensen*, 55 P.3d 135, 139 (Colo. App. 2001).

¶ 83     The following chart contains our analysis of the hearsay statements Draper challenges on appeal.[8]

| Evidence | Preservation | Analysis |
|---|---|---|
| Talisa Brown testified that "[A.D.] said Draper made three specific threats against her and that [A.D.] said she told Draper she cheated on him, that admission changed their relationship, she wanted to leave him, she was unhappy and worried for her, her kids, and Draper, and she felt like a mistress/second wife." | Draper objected to the admission of this evidence under CRE 807, so this claim was preserved for appeal. *See Pahl*, 169 P.3d at 183. | The trial court considered the fact that A.D. and Brown were friends; that these statements concerned A.D.'s relationship with her husband, a topic with which she would have been intimately familiar; that A.D. did not have an apparent motive to lie; that these statements were made in the course of regular conversation; and that A.D.'s demeanor changed when she made these statements to Brown. The trial court did not abuse its discretion by finding, based on these factors, that these statements had circumstantial guarantees of trustworthiness. |

---

[8] To avoid any mischaracterization of Draper's claims, we quote directly from Draper's opening brief.

| Evidence | Preservation | Analysis |
|---|---|---|
| Belinda Godwin testified that "[A.D.] said she and Draper had been arguing, Draper was causing her sadness, and she needed a vacation/break. Godwin also testified to a specific occasion in which Draper manipulated [A.D.], as represented to her by [A.D.]." | Draper objected to the admission of this evidence under CRE 807. Thus, this claim of error was preserved for appeal. | The trial court considered the fact that A.D. and Godwin were coworkers along with the other factors above to find that these statements had circumstantial guarantees of trustworthiness. We perceive no abuse of discretion. |
| Makia Sharp testified that "[A.D.] voiced concerns about her marriage to Draper, she wanted to get away from Draper, she wanted out of the marriage, that Draper was going to kill her so she had to get away (repeatedly), that she was tired, and that Draper left his gun in her purse." | Draper objected to this testimony under CRE 807, so this claim of error was preserved for appeal. | The trial court did not abuse its discretion by considering the fact that A.D. and Sharp were friends (who considered each other to be like sisters) along with the other factors detailed above to find that these statements had circumstantial guarantees of trustworthiness. |

| Evidence | Preservation | Analysis |
|---|---|---|
| Antoine Webb testified that "[A.D.] told him, or at least her social media account told him, that she loved him, which was unusual." | Draper objected to this testimony under CRE 807, so this claim of error was preserved for appeal. | The trial court considered the fact that A.D. and Webb were once romantically involved along with the other factors detailed above to find that this statement had circumstantial guarantees of trustworthiness.  We fail to see how this statement had circumstantial guarantees of trustworthiness.  Therefore, the trial court abused its discretion by admitting this statement under CRE 807. |

| Evidence | Preservation | Analysis |
|---|---|---|
| Ebony Barnes testified that "[A.D] nonchalantly said she needed to get away from Draper, he was going to killer [sic] her, and she was worried about her kids." | At the pretrial hearing, defense counsel did not object to this evidence until after the court ruled that the statements were admissible under CRE 807. Thus, this claim of error may not have been preserved for appeal. *See Wilson v. People*, 743 P.2d 415, 419 (Colo. 1987). | We need not resolve whether this claim of error was preserved for appeal because we conclude that the trial court did not abuse its discretion by finding that this evidence had the circumstantial guarantees of trustworthiness required by CRE 807. The trial court considered the fact that Barnes and A.D. were friends and that A.D. made these statements while Barnes was doing her hair along with the other factors detailed above to find that these statements had circumstantial guarantees of trustworthiness. We perceive no abuse of discretion. |

| Evidence | Preservation | Analysis |
|---|---|---|
| Stasha Wells testified that "[A.D.] told her, after a third injury she saw [A.D.] with and after much questioning, that she had 'gotten into' an argument with Draper, that he had strangled her to the point of passing out, that the Monday before her death [A.D.] reiterated how she wanted to be done with Draper and their marriage but she did not know how to be done with him, that Draper was going to kill her, and that Draper would not leave her alone." | Draper objected to this testimony under CRE 807, so this claim of error was preserved for appeal. | The trial court did not abuse its discretion by considering the fact that Wells and A.D. were friends along with the other factors detailed above to find that these statements had circumstantial guarantees of trustworthiness. |
| Blair Jackson testified about "a letter and voicemail in which [A.D.] [alleged] Draper told her he would harm or kill her if he did not get what he wanted." | Draper objected to this testimony under CRE 807, so this claim of error was preserved for appeal. | The trial court considered the fact that Jackson and A.D. were coworkers along with the other factors detailed above to find that these statements had circumstantial guarantees of trustworthiness. We perceive no abuse of discretion. |

| Evidence | Preservation | Analysis |
|---|---|---|
| Javon Barker testified that "[A.D.] said she and Draper were having issues, he thought she was cheating on him, she did not want to do anything, she wanted to be married and to give it a try, Draper told her how to dress and put on makeup to appear less attractive, she relies on Draper for rides, and Draper accused her of cheating." | At the pretrial hearing, defense counsel did not object to this evidence until after the court ruled that the statements were admissible under CRE 807. Thus, this claim of error may not have been preserved for appeal. *See Wilson*, 743 P.2d at 419. | We need not resolve whether this claim of error was preserved for appeal because we conclude that the trial court did not abuse its discretion by finding that this evidence had the circumstantial guarantees of trustworthiness required by CRE 807. The trial court considered the fact that Barker and A.D. were cousins along with the other factors detailed above to find that these statements had circumstantial guarantees of trustworthiness. This does not amount to an abuse of discretion. |

¶ 84    In addition to his argument that the above statements lacked circumstantial guarantees of trustworthiness, Draper also argues that the fact that seven witnesses testified to the same evidence violated CRE 807(B) and (C).

¶ 85    CRE 807(B) requires the statement to be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." The trial court found that A.D.'s statements to her friends and family were more

probative than any other evidence available to the prosecution because A.D. and Draper "were in a position to know better than anyone else the nature of their relationship." True, the trial court allowed multiple witnesses to testify to statements A.D. made to them before she was murdered. But A.D.'s statements that Draper had threatened to kill her, that she and Draper argued, and that she wanted to leave the relationship dealt with different topics.[9] Accordingly, the trial court did not abuse its discretion by admitting the challenged statements under CRE 807.[10]

---

[9] CRE 807(C) requires that the "general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." Draper's arguments that the admission of these statements violated CRE 807(C) and that discussions about abortion were irrelevant are underdeveloped. We do not address underdeveloped arguments. *Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 604 (Colo. App. 2007).

[10] Draper may also challenge the admission of A.D.'s statements under CRE 404(b). We conclude that many of A.D.'s statements may have been admissible as res gestae to fully explain the charged conduct to the jury. *See People v. Quintana*, 882 P.2d 1366, 1373 (Colo. 1994). Alternatively, this evidence may have been admissible to show Draper's state of mind, the absence of mistake or accident, or motive as direct evidence of guilt or under CRE 404(b). A trial court's decision to admit evidence may be defended by any ground supported by the record, even if that ground was not considered by the trial court. *Quintana*, 882 P.2d at 1371.

## D. CRE 404(b)

¶ 86    CRE 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." CRE 404(b)(2).

¶ 87    Courts determine the admissibility of uncharged crimes, wrongs, or acts under CRE 404(b) by applying a four-step analysis: (1) the evidence must relate to a material fact; (2) the evidence must be logically relevant to that material fact; (3) the logical relevance must be independent of the prohibited character inference described above; and (4) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990).

¶ 88    The following chart contains our analysis of the evidence Draper claims was admitted in violation of CRE 404(b).

41

| Evidence | Preservation | Analysis |
|---|---|---|
| Tyseonna Draper testified that "Draper asked her if she knew [A.D.] to be cheating on him and that she knew Draper to have taken [A.D.]'s phone to text 'some dude.'" | Draper objected to this evidence under CRE 404(b), so this claim of error was preserved for appeal. *See Pahl*, 169 P.3d at 183. | This evidence is not governed by CRE 404(b) because it is not evidence of other crimes, wrongs, or acts. Instead, this evidence was directly relevant to show Draper's state of mind and motive. Accordingly, the trial court did not abuse its discretion by admitting this evidence. |
| Antoine Webb testified that he thought "Draper was parading as [A.D.] to uncover if she was cheating on him." | Draper objected to the evidence of the phone call between himself and Webb. However, he did not specifically object to the evidence that Webb thought Draper was parading as A.D. to uncover any cheating. This claim of error may not have been preserved for appeal. *See People v. Ujaama*, 2012 COA 36, ¶ 37. | Regardless of whether this exact claim of error was preserved for appeal, we conclude that the court did not err by admitting this evidence. Evidence that Draper was "parading" as A.D. to uncover any cheating is not a crime, wrong, or other act. Instead, this evidence was directly relevant to show Draper's state of mind and motive. Accordingly, the trial court did not abuse its discretion by admitting this evidence. |

| Evidence | Preservation | Analysis |
|---|---|---|
| Makia Sharp testified about "the gun Draper had and about how Draper and [A.D.] argued about [A.D.]'s conversations with Webb, of which Draper alleged he had a recording." | Draper objected to Sharp's testimony about the car accident and injuries to A.D. but not to the specific testimony challenged on appeal. Accordingly, this issue was not preserved for appeal. *Ujaama*, ¶ 37. We review unpreserved claims for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. | Evidence that Draper had a gun (the type of weapon used to carry out both crimes) was admissible as direct evidence of guilt. Evidence that Draper and A.D. argued about A.D.'s conversations with Webb related to the material fact of Draper's state of mind and motive. This evidence was logically relevant to Draper's state of mind and motive. The relevance of this evidence was independent of the prohibited character inference. This evidence was not unfairly prejudicial. Thus, this evidence was admissible under CRE 404(b). Because this evidence was admissible as direct evidence of guilt and under CRE 404(b), the court did not err (much less plainly err) by admitting this evidence. |

43

| Evidence | Preservation | Analysis |
|---|---|---|
| Stasha Wells testified about "[A.D.]'s injuries from Draper, always while she was pregnant, and controlling her phone." | Draper objected to this evidence under CRE 404(b), so this claim is preserved for appeal. | Evidence that Draper injured A.D. and that he controlled her phone was logically relevant to Draper's motive, intent, and absence of mistake. The relevance of this evidence was independent of the prohibited character inference and not unfairly prejudicial. Therefore, the trial court did not abuse its discretion by admitting this evidence under CRE 404(b). |

| Evidence | Preservation | Analysis |
| --- | --- | --- |
| Ebony Barnes testified "to [A.D.]'s injuries, to Draper controlling her phone, to his owning guns, and to them fighting." | Draper objected to this evidence under CRE 404(b), so this claim is preserved for appeal. | As analyzed above, evidence that Draper owned guns was admissible as direct evidence of guilt. Also, as analyzed above, evidence of A.D.'s injuries and Draper controlling A.D.'s phone was admissible evidence of motive, intent, and absence of mistake under CRE 404(b). Evidence that A.D. and Draper fought was likewise logically relevant to Draper's motive, intent, and absence of mistake. The relevance of this evidence was independent of the prohibited character inference and not unfairly prejudicial. Thus, the trial court did not abuse its discretion by admitting this evidence under CRE 404(b). |
| Nyaire Humphrey testified "to the many fights, including one the night before [A.D.]'s death, that Draper and [A.D.] had, and the many guns that Draper had." | Draper objected to this evidence under CRE 404(b), so this claim is preserved for appeal. | As already analyzed, evidence that Draper owned a gun was admissible as direct evidence of guilt, and evidence that Draper and A.D. fought was admissible under CRE 404(b). Accordingly, the trial court did not abuse its discretion by admitting this evidence. |

| | | |
|---|---|---|
| Tamika Smith was impeached with "Exhibit 299, which revealed Draper to be frequently caught up in something bad, disrespectful of people generally, in trouble with the law often, scared of going back to jail, prepared to flee, unreliable, and a bad parent." | Draper objected to the admission of exhibit 299, a video interview of Smith. However, he did not object to these statements under CRE 404(b). An issue is unpreserved for review when an objection was made in the trial court, but on "unspecific grounds which would not have alerted the trial court to the issue of which the defendant now seeks review." *Ujaama*, ¶ 37. Because Draper did not object to these statements under CRE 404(b), this claim was not preserved, and we review it only for plain error. *Hagos*, ¶ 14. | As pertinent here, plain error must be substantial — meaning that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the conviction. *Hagos*, ¶ 14. Any error was not substantial because the evidence challenged on appeal was much less inculpatory than the admissible evidence that Draper threatened to kill A.D. and was found with the gun used to kill her less than two days after she was found shot to death. Accordingly, the admission of this evidence did not so undermine the fundamental fairness of the trial or cast serious doubt on the reliability, and any error was not plain. |

## E. Harmlessness

¶ 89    We have concluded that the court abused its discretion by admitting Webb's testimony that A.D. told him through social media that she loved him.  We now conclude that this error was harmless.  Additionally, assuming that any of the other evidence addressed above was improperly admitted, any such error does not require reversal.

¶ 90    "[W]e review nonconstitutional trial errors that were preserved by objection for harmless error."  *Hagos*, ¶ 12.  "[A]n objected-to trial error is harmless if there is no reasonable possibility that it contributed to the defendant's conviction."  *Pernell v. People*, 2018 CO 13, ¶ 22.  "[T]he strength of the properly admitted evidence supporting the guilty verdict is clearly an 'important consideration' in the harmless error analysis."  *Id.* at ¶ 25 (quoting *Crider v. People*, 186 P.3d 39, 43 (Colo. 2008)).

¶ 91    As explained above, Draper's conduct of shooting and hitting at least three occupied vehicles as he drove down the street constituted the quintessential example of attempted extreme indifference murder.  The inculpatory value of this undisputed

evidence completely overshadowed the inculpatory value of the challenged CRE 807 or CRE 404(b) evidence.

¶ 92 Regarding Draper's conviction for the murder of A.D., the inculpatory value of the admissible evidence that one of the guns found in the car Draper hijacked was the gun used to murder A.D. likewise completely overshadowed the inculpatory value of the challenged CRE 807 or CRE 404(b) evidence. Therefore, we conclude that the trial court's erroneous admission of Webb's testimony was harmless and that even if any of the other challenged CRE 807 or CRE 404(b) evidence was improperly admitted, any error was harmless.

## VI. Attempted Extreme Indifference Murder

¶ 93 Finally, Draper contends that his convictions for attempted extreme indifference were unconstitutional.

### A. Equal Protection

¶ 94 Draper argues that attempted extreme indifference murder, a class 2 felony, and illegal discharge of a firearm, a class 5 felony, proscribe the same conduct but impose different penalties, thereby violating his right to equal protection of the laws.

¶ 95     Equal protection of the laws is guaranteed by the United States and Colorado Constitutions.  U.S. Const. amend. XIV, § 1; Colo. Const. art. 2, § 25; *Howard v. People*, 2020 CO 15, ¶ 12.  In Colorado (but not under the United States Constitution), a criminal statute violates equal protection when it "proscribe[s] the same criminal conduct" as another statute but "with disparate criminal sanctions," and when "separate statutes [proscribe] with different penalties what ostensibly might be different acts, but [offer] no intelligent standard for distinguishing the proscribed conduct." *People v. Castro*, 657 P.2d 932, 940 (Colo. 1983) (quoting *People v. Marcy*, 628 P.2d 69, 74-75 (Colo. 1981)), *overruled on other grounds by West v. People*, 2015 CO 5; *see also Howard*, ¶ 12.

¶ 96     A review of the statutory definitions of attempted extreme indifference murder and illegal discharge of a firearm reveals an intelligent standard to distinguish the conduct proscribed by these offenses that justifies the resulting difference in penalty.

¶ 97     Extreme indifference murder has the following elements: (1) under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally; (2) knowingly engaging in conduct which creates a grave

49

risk of death to another; and (3) thereby causing the death of another. § 18-3-102(1)(d). Criminal attempt is further defined as "acting with the kind of culpability otherwise required for commission of an offense" and engaging in conduct constituting a substantial step, which is defined as "any conduct, whether act, omission, or possession, which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." § 18-2-101(1).

¶ 98 By contrast, illegal discharge of a firearm has the following elements: (1) knowingly or recklessly discharging a firearm; and (2) into any dwelling or any other building or occupied structure, or into any motor vehicle occupied by any person. § 18-12-107.5(1), C.R.S. 2020.

¶ 99 There are substantial differences between the elements of these crimes. Accordingly, there is an intelligent standard to distinguish these two crimes that justifies the difference in penalty, and there is no equal protection violation.[11]

---

[11] Draper also apparently alleges that his conviction violated the separation of powers doctrine. This argument is underdeveloped, so we do not address it. *Antolovich,* 183 P.3d at 604.

## B. Vagueness

¶ 100 Draper finally contends that he was not on notice that he could be guilty of attempted first degree extreme indifference murder if no one was injured. To the extent we understand this argument, we reject it.

¶ 101 The completed crime of extreme indifference murder requires that the defendant "cause[] the death of another." *See* § 18-3-102(1)(d). Draper was convicted of *attempted* extreme indifference murder. Attempt crimes require proof that the actor took a substantial step toward, but did not complete, the crime. § 18-2-101(1); *People v. Buerge*, 240 P.3d 363, 367 (Colo. App. 2009). In *Castro*, 657 P.2d at 941, the supreme court held that a substantial step required for a conviction of attempted extreme indifference murder is "conduct which poses a real and proximate risk of death to the victim." Applying *Castro*, the supreme court in *People v. Ramos*, 708 P.2d 1347, 1350 (Colo. 1985), held that the proper inquiry was not the extent of the victim's injuries but the defendant's conduct. Accordingly, the supreme court rejected the argument that proof of a significant injury was required to establish attempted extreme indifference murder. *Id.*

¶ 102    Draper's conduct of shooting at multiple occupied vehicles posed a real and proximate risk of death to the victims regardless of whether any of the victims sustained injuries.  Therefore, we reject Draper's vagueness challenge.

## VII.   Conclusion

¶ 103    The judgment of conviction is affirmed.

JUDGE RICHMAN and JUDGE WELLING concur.