19CA0504 Peo v Faudoa 12-16-2021 COLORADO COURT OF APPEALS Court of Appeals No. 19CA0504 Weld County District Court No. 18CR958 Honorable Timothy G. Kerns, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Gabriel Faudoa, Defendant-Appellant. JUDGMENT AFFIRMED Division V Opinion by JUDGE GOMEZ Richman and Harris, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced December 16, 2021 Philip J. Weiser, Attorney General, Rebecca A. Adams, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Elyse M. Maranjian, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Gabriel Faudoa, appeals the judgment of conviction entered after a jury found him guilty of assault. We affirm. I. Background ¶ 2 Faudoa and his sister (the victim) lived in separate camper trailers in their mother’s backyard. ¶ 3 One night, the two siblings got into an argument inside the victim’s trailer and continued arguing outside the trailer with their mother present. At some point, the victim told Faudoa he was “nothing but a low life piece of shit.” That angered Faudoa, as their mother reported based on the reaction in his face and voice. Suddenly, the siblings were hitting each other.1 Faudoa put his hands on the victim’s throat as the victim screamed.2 Eventually, the mother intervened, and Faudoa left and went into his trailer. ¶ 4 The victim went into her mother’s home, called 911, and told the dispatcher that her “brother just choked [her] out and scratched 1 At trial, the siblings’ mother said she couldn’t tell which of them had started the hitting. However, other evidence at trial indicated she had previously said that Faudoa started it. 2 The siblings’ mother’s statements were also inconsistent as to how long Faudoa held the victim’s throat. She told investigating officers it was one to two minutes but testified at trial it was only seconds. 
2 [her].” The call disconnected, and the victim immediately called back and provided further details. ¶ 5 Responding officers testified that the victim was clearly upset: “her emotions were elevated” and she appeared to have been crying, as “[h]er face was red [and] her eyes were watery, bloodshot, [and] puffy.” The officers noted her difficulty speaking. For instance, they said “her voice was hoarse,” “almost like she had laryngitis, where her voice was going in and out”; “her voice became very scratch[y] and high-pitched” and eventually “[s]he was whispering” and could hardly be heard at all; and she was “coughing [and] wheezing.” They also testified to seeing red marks on her throat and on the side of her face. ¶ 6 The victim’s sister-in-law, whom the victim called shortly after calling the police, similarly reported that “[s]he was crying hysterically,” “[s]he was really upset,” and “[h]er voice was hoarse, kind of like she had a cold, and like hard for her to talk . . . hard to push out the words, and the volume was like raspy.” ¶ 7 Photos of the victim revealed red marks on her neck and an abrasion on her cheek. 
3 ¶ 8 Faudoa was arrested and charged with second degree assault. He was also later charged with witness tampering for statements he made to his mother while he was in jail. ¶ 9 The victim didn’t testify at trial. The jury heard the evidence recounted above, as well as testimony from an expert on strangulation. At the end of trial, the jury found Faudoa guilty of the assault charge but not guilty of the witness tampering charge. Faudoa now appeals. II. Analysis ¶ 10 Faudoa raises two contentions on appeal: (1) that the trial court improperly admitted portions of the victim’s 911 calls; and (2) that the prosecutor committed misconduct during the trial. We address each contention in turn. A. 911 Calls ¶ 11 Faudoa contends that the trial court erred in admitting portions of the victim’s 911 calls because they (1) violated his right to confront the witnesses against him; (2) contained inadmissible hearsay; and (3) were inadmissible under CRE 403. We disagree. 
4 1. Additional Facts ¶ 12 Before the trial, the prosecution filed a motion indicating that the victim was unavailable to testify at trial, as she may have moved out of state and couldn’t be served with a subpoena, and asking the court to admit her statements from the two 911 calls. Defense counsel objected, arguing the statements were inadmissible under the Confrontation Clause, as hearsay, and under CRE 403. ¶ 13 The trial court addressed the issue at a pretrial hearing. The court ordered that the first call — which was about twenty seconds long and included only two statements by the victim, that “my brother just choked me out and scratched me” and her address — was admissible in its entirety because “the entirety of that 911 call was made for purposes of obtaining a police response.” ¶ 14 The court then analyzed each separate statement by the victim in the second call — which immediately followed the first and was over five minutes long (unredacted). The court determined that some of the victim’s statements were admissible to describe the scene and her need for a police response, but others were not. In the end, the court admitted the following statements: 
5  “My brother just choked me out until I couldn’t breathe and smacked me across the face.”  Faudoa was at that time in his trailer.  She didn’t need medical attention but needed the police there “as soon as possible.”  She was at that time in the house with her mother.  “Look at my neck” (apparently said to her mother, not to the dispatcher).3 ¶ 15 The court excluded several other statements by the victim, including, among others, statements that Faudoa was drunk, that she hadn’t done anything to provoke him, and that he had hit her across the face and choked her until she couldn’t breathe. ¶ 16 The calls, redacted to exclude the portions of the second call that were held inadmissible, were played to the jury at trial. 3 The court also allowed the admission of statements indicating that no weapons were present and that officers had just arrived, but the redacted recording admitted at trial didn’t include those statements. 
6 2. Confrontation Clause ¶ 17 Faudoa argues that the admission of the victim’s statements from the 911 calls violated his rights under the Confrontation Clause. We disagree. ¶ 18 Defendants have a right under the Confrontation Clause in both the United States and the Colorado Constitutions to confront the witnesses against them. U.S. Const. amend. VI; Colo. Const. art. II, § 16; People v. Hernandez, 2021 CO 45, ¶ 19. These constitutional provisions preclude the introduction of testimonial hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. People v. Garcia, 2021 CO 7, ¶ 8; see also id. at ¶ 7 n.2 (the protections are equivalent and the analysis is the same under the federal and the state constitutions). But nontestimonial hearsay isn’t similarly excluded and is only subject to the rules of evidence. People v. Draper, 2021 COA 120, ¶ 77. ¶ 19 A statement is testimonial if, viewed objectively and in light of all the circumstances, its primary purpose at the time it was made was to be a substitute for trial testimony. Garcia, ¶ 9; Draper, ¶ 78. Thus, for instance, when the circumstances of an interrogation 
7 objectively indicate that its primary purpose is “to elicit statements that establish or prove past events, or to elicit statements that are potentially relevant to a later criminal prosecution, the statements elicited are testimonial.” Raile v. People, 148 P.3d 126, 130 (Colo. 2006). By contrast, “statements made during an ongoing emergency to assist police officers in their efforts to assess the present situation are nontestimonial.” Id. ¶ 20 Likewise, “[a] 911 call, . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to ‘establis[h] or prov[e]’ some past fact, but to describe current circumstances requiring police assistance” and thus is ordinarily nontestimonial. Davis v. Washington, 547 U.S. 813, 827 (2006) (alteration in original) (citation omitted). Ultimately, whether statements during a 911 call are testimonial depends on whether they were made for the purpose of getting help or to provide information for investigative purposes. Id. at 827-28 (a statement during a 911 call identifying the defendant as the caller’s assailant was not testimonial because the caller was speaking about events as they were happening rather than describing past events, the caller was facing an ongoing emergency, the statements were 
8 necessary to resolve the present emergency rather than just to learn what had happened in the past, and the interview was informal, with the caller’s answers “frantic” and “in an environment that was not tranquil”); People v. Cevallos-Acosta, 140 P.3d 116, 128-29 (Colo. App. 2005) (a statement during a 911 call identifying the defendant as the perpetrator of a crime was nontestimonial because “the caller was seeking immediate help for the victim; the circumstances were exigent; and the statement . . . was neither elicited by nor made to anybody with authority”). ¶ 21 We review de novo whether the admission of evidence violated a defendant’s confrontation right. Garcia, ¶ 6. Similarly, we review de novo the legal question whether a statement is testimonial. People v. Trevizo, 181 P.3d 375, 378 (Colo. App. 2007). ¶ 22 Faudoa argues that the admitted statements were testimonial, and thus were improperly admitted, because they “describe[] the events as having taken place in the past,” using the past tense, rather than what was currently happening; there was “no ongoing emergency or immediate danger”; and the victim “insiste[d] that she did not need medical attention but wanted the police to respond,” suggesting the focus was on later criminal prosecution. 
9 ¶ 23 We are not persuaded. Instead, we agree with the trial court’s assessment that the statements were not testimonial. Viewing the statements objectively, their primary purpose was to elicit a police response to what the victim perceived as an ongoing emergency. Despite Faudoa’s description of the emergency as having passed by then, the victim may have felt Faudoa was an ongoing threat since, according to her statements, the assault had “just” occurred and he was still in his trailer on the property. And although the victim didn’t believe she needed medical care, her demeanor on the calls was “frantic,” much like the caller in Davis, 547 U.S. at 827. ¶ 24 We conclude, then, that each of the admitted statements was nontestimonial. The victim’s statements at the beginning of both calls saying her brother had “choked [her] out” and “scratched” or “smacked” her were, like most initial statements in a 911 call, made not to establish past facts but “to describe current circumstances requiring police assistance.” Id. The victim may have used the past tense, as she was speaking right after rather than during the choking, but that doesn’t negate the fact that she was explaining to the dispatcher why she needed police assistance. The statements about where Faudoa was, where the victim was, who she was with, 
10 and her need for police but not medical assistance described what was then occurring and could enable authorities to adequately respond to the situation. And the comment to “[l]ook at my neck” was apparently made to the victim’s mother, not to the dispatcher or for the purpose of establishing a fact at trial. See Ohio v. Clark, 576 U.S. 237, 249 (2015) (“Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers.”). 3. Hearsay ¶ 25 Faudoa next argues that the victim’s statements in the 911 calls were hearsay statements that don’t fall under the excited utterance exception. Again, we disagree. ¶ 26 Hearsay statements, which are statements made by someone other than the declarant while testifying at trial that are offered to prove the truth of the matter asserted, are generally inadmissible unless they fall within an exception. CRE 801(c), CRE 802. ¶ 27 One such exception applies to an excited utterance, which is a “statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or 
11 condition.” CRE 803(2). To fall within this exception, a statement must (1) relate to an event that is sufficiently startling to render inoperative normal reflective thought processes of the observer; (2) be a spontaneous reaction to the occurrence; and (3) be supported by evidence that the declarant observed the event. People v. Vanderpauye, 2021 COA 121, ¶ 31. ¶ 28 In determining whether a statement was spontaneous, courts may consider such factors as the lapse of time after the startling event, whether the statement was made in response to an inquiry, whether it was accompanied by outward signs of excitement or emotional distress, and the choice of words used. People v. Abdulla, 2020 COA 109M, ¶ 65. Statements made in response to questioning can be excited utterances. Id. at ¶ 72. ¶ 29 A trial court is best positioned to determine whether a statement was an excited utterance. Id. at ¶ 65. Thus, we review its decision for an abuse of discretion. Vanderpauye, ¶ 16. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. Id. ¶ 30 While defense counsel raised this objection in her pretrial filing, the court didn’t rule on it at the hearing. And when counsel 
12 objected to admission of the 911 calls at trial, she raised only other issues but not hearsay. Nonetheless, we will treat this objection as preserved and assume the trial court implicitly overruled the objection. See People v. Butler, 2017 COA 117, ¶ 47. ¶ 31 We perceive no abuse of discretion in allowing the statements into evidence as excited utterances. It’s clear from both calls that the victim was reacting to a startling event she had experienced; that she was crying, breathing heavily, and still under the stress of that event; and that her words were more of a spontaneous reaction to the event than the operation of a normal reflective thought process. See Vanderpauye, ¶ 31; Abdulla, ¶ 65. ¶ 32 We reject Faudoa’s arguments to the contrary. Although the prosecution didn’t establish exactly how much time passed between the assault and the victim’s 911 calls, other evidence supported that the calls were made very soon after the assault and while the victim was still acting under the stress of the assault. For instance, the victim said her brother had “just” choked her, and she was crying, breathing heavily, and speaking frantically during the calls. See Compan v. People, 121 P.3d 876, 883 (Colo. 2005) (evidence that the victim was upset, crying, and talking excitedly during two 
13 calls to a friend following an assault indicated that the calls were made “in near temporal proximity to the startling event”), overruled on other grounds by Nicholls v. People, 2017 CO 71. And the responding officers and sister-in-law who spoke to the victim shortly after the calls reported that “her emotions were elevated,” “[s]he was really upset,” and “[s]he was crying hysterically.” See People v. Martinez, 18 P.3d 831, 835 (Colo. App. 2000) (descriptions of the victim as being distressed, emotional, and upset supported findings that her assault was startling and that her statements were made under the stress caused by the assault). ¶ 33 Nor is application of the exception undermined by the fact that the victim had moved a short distance away from the location of the assault before calling 911. It is enough that the evidence from the calls and from other witnesses suggests she was still under the stress of the assault. See Compan, 121 P.3d at 883 (evidence of the victim’s emotional distress supported application of the exception to statements she made to a friend after she had removed herself from the immediate vicinity of an assault); People v. King, 121 P.3d 234, 238 (Colo. App. 2005) (evidence of the victim’s emotional distress supported application of the exception to statements she made an 
14 unknown period of time after she was assaulted and stabbed and after she had reached a place of safety). 4. CRE 403 ¶ 34 Faudoa also argues that the victim’s statements in the 911 calls should’ve been excluded under CRE 403 because they were “emotionally charged” yet had minimal probative value because they didn’t provide context for the incident. We disagree. ¶ 35 Relevant evidence may be excluded “if its probative value is substantially outweighed by the danger of unfair prejudice.” CRE 403. “Evidence is unfairly prejudicial if it has an ‘undue tendency to suggest a decision on an improper basis . . . such as sympathy, hatred, contempt, retribution, or horror.’” People v. Clark, 2015 COA 44, ¶ 18 (alteration in original) (quoting People v. James, 117 P.3d 91, 93-94 (Colo. App. 2004)). In reviewing the court’s ruling, we assume the maximum probative value a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected. Id. ¶ 36 The trial court rejected defense counsel’s CRE 403 objection at trial, finding that the “probative value [of the evidence] is not substantially outweighed by any asserted prejudice.” We review 
15 this ruling for an abuse of discretion. See Vanderpauye, ¶ 16. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. Id. ¶ 37 We discern no abuse of discretion in admitting the statements. The statements were probative in setting the scene of the crime and establishing what had happened. In particular, the victim’s statement that her brother had “choked [her] out until [she] couldn’t breathe” made it more likely than not that Faudoa had applied sufficient pressure to impede or restrict the victim’s breathing — a fact that was hotly contested at trial and was relevant to establishing one of the elements of second degree assault. See § 18-3-203(1)(i), C.R.S. 2021. ¶ 38 The statements also were not overly emotional or otherwise unfairly prejudicial. And to the extent that the statements that were admitted didn’t provide further context, it was because Faudoa had successfully prevented the admission of other statements during the call about what may have led to the incident. B. Prosecutorial Misconduct ¶ 39 Faudoa argues that the prosecutor committed misconduct by (1) making statements regarding the victim’s absence at trial that 
16 suggested the case had been prescreened, presented the prosecutor’s personal opinion of Faudoa’s guilt, and implied personal knowledge of evidence not presented to the jury; and (2) inflaming the jury’s passion. We disagree. ¶ 40 We apply a two-step analysis in evaluating claims of prosecutorial misconduct. People v. Curtis, 2021 COA 103, ¶ 49. First, we determine whether the prosecutor’s statements were improper based on the totality of the circumstances. Id. Then, if the statements were improper, we determine whether the conduct warrants reversal under the applicable standard — harmless error if the defendant objected in the trial court (and the error is not of a constitutional dimension) and plain error if the defendant did not. Id. at ¶¶ 49-50; People v. Sauser, 2020 COA 174, ¶ 80. ¶ 41 Faudoa preserved some of his objections but failed to preserve others. For those that are preserved, reversal is required under the harmless error standard only if an error substantially influenced the verdict or affected the fairness of the trial. Sauser, ¶ 80. For those that are not preserved, reversal is required under the plain error standard only if an error was obvious and was substantial, meaning that it so undermined the fundamental fairness of the trial 
17 as to cast serious doubt on the reliability of the judgment of conviction. People v. Maloy, 2020 COA 71, ¶ 11. ¶ 42 The trial court has discretion to determine whether a prosecutor has committed misconduct. People v. Snider, 2021 COA 19, ¶ 31. Accordingly, we won’t disturb the court’s rulings on claims of misconduct absent a gross abuse of discretion resulting in prejudice and a denial of justice. Sauser, ¶ 78. 1. Statements Related to the Victim’s Absence ¶ 43 Faudoa argues that in an effort to explain why the victim wasn’t appearing at trial and why the prosecution was proceeding in her absence, the prosecutor made various statements improperly suggesting that the case had been prescreened, that she personally believed Faudoa was guilty, and that she was aware of evidence not presented to the jury. We are not persuaded. ¶ 44 Faudoa challenges statements made at three separate times at trial. First, he points to the prosecutor’s statements during voir dire. At one point, the prosecutor said, [Y]ou will not hear from the victim in this case. She will not come in, testify against her brother. I wanted to talk about whether or not the District Attorney’s office and law enforcement should continue in cases -- 
18 ¶ 45 Defense counsel objected that this was a “stake-out” question, and the court overruled the objection. The prosecutor went on to ask the prospective jurors to consider why someone might not want to testify against a family member and whether they would be concerned about the victim’s absence at trial. She then stated, In a scenario where a person feels uncomfortable, feels pressure from her family, feels like maybe it would be worse if she came to court, is that something you can imagine as a reason why someone would not want to come to court and testify? ¶ 46 Defense counsel objected. The court sustained the objection; struck that statement; and instructed the jury that it wasn’t to speculate as to why the prosecution “may or may not present certain evidence” but was to “weigh the evidence that is in the record” and, as appropriate, “consider the lack of evidence.” ¶ 47 Faudoa next points to the following remarks by the prosecutor during opening statement: The first thing you’re going to hear about is the fact that [the victim] will not be testifying. You already heard about that. How am I going to prove this case without [the victim]? You are not going to hear from her on the stand, but you are going to hear from her within the rules of evidence. I am going to provide you with everything I can, all the statements that I can. 
19 ¶ 48 Defense counsel objected on the basis that the prosecutor was testifying. The court overruled the objection. ¶ 49 Finally, Faudoa points to these statements in the prosecutor’s closing argument: PROSECUTOR: [T]his is a difficult case. It’s challenging. I made no surprise, no mystery about it when I talked to you during jury selection. But every single one of you told me that if the evidence was there, law enforcement should investigate, the District Attorney should pursue. DEFENSE COUNSEL: Objection. Using office status to convey credibility based on charges. THE COURT: I’m going to sustain. This is as to evidence, not charging decision. PROSECUTOR: All of you said if the evidence was there, you thought it was okay, and, in fact, you thought it was right for charges to be brought -- DEFENSE COUNSEL: Objection. PROSECUTION: -- if that was appropriate. THE COURT: Overruled. ¶ 50 Prosecutors have wide latitude to make arguments based on the facts in evidence and reasonable inferences that may be drawn from those facts. People v. Strock, 252 P.3d 1148, 1153 (Colo. App. 2010). Nonetheless, prosecutors must not use improper methods 
20 calculated to produce a wrongful conviction. People v. Fortson, 2018 COA 46M, ¶ 13. Thus, for instance, they may not refer to a screening process that a case was sufficient to pass through, Domingo-Gomez v. People, 125 P.3d1043, 1052 (Colo. 2005); express a personal opinion as to the defendant’s guilt, People v. Rhea, 2014 COA 60, ¶ 75; or suggest they have personal knowledge of evidence unknown to the jury, Fortson, ¶ 48. ¶ 51 The statements challenged in this case did not run afoul of these rules. First, the prosecutor didn’t suggest the case had been screened or even allude to a screening process. Cf. Domingo-Gomez, 125 P.3d at 1052 (prosecutor expressly referenced “a screening process for charging cases,” which the prosecutor said “takes the type of evidence that we have here”). What she referred to instead was a choice to continue prosecuting the case without assistance from the victim. That reference, unlike a statement about screening, doesn’t “convey that the prosecution had additional inculpatory evidence unknown to the jury.” Id. And the apparent point of the prosecutor’s statements was not to improperly bolster the decision to prosecute the case but, instead, to elicit jurors’ reactions to a criminal case proceeding without a testifying victim 
21 and to argue that the evidence could support a conviction even without the victim’s testimony. ¶ 52 Second, the prosecutor didn’t express a personal belief in Faudoa’s guilt. None of her challenged statements referred to her own beliefs about Faudoa’s guilt. Instead, they focused on the absence of the victim and the evidence supporting a finding of guilt. Cf. People v. Vialpando, 2020 COA 42, ¶ 57 (prosecutor told the jury, among other things, “I think you’ll agree with me at the end of testimony, that the defendant is guilty of the charges”) (cert. granted Oct. 12, 2020). ¶ 53 And third, the prosecutor didn’t suggest that she was aware of evidence unknown to the jury that would support a guilty verdict. Her statement that she was going to offer all the evidence she could under the rules of evidence was vague and didn’t necessarily imply that she was aware of additional evidence she couldn’t present to the jury — particularly given that she made this statement in the context of proceeding in the absence of testimony from the victim. Nor did her statement give any indication, if there was any other evidence, what that evidence might be. Cf. Fortson, ¶¶ 47-48 
22 (prosecutor said the defendant had committed instances of sexual assault in addition to those charged). ¶ 54 At most, some of the prosecutor’s statements may have been inartful. See People v. Samson, 2012 COA 167, ¶ 30 (“[B]ecause arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful.”). But they did not cross the line into prosecutorial misconduct. ¶ 55 And, to the extent that any of the prosecutor’s statements were objectionable, they were brief and isolated, were cured by the trial court’s rulings sustaining some of the objections and striking one of the statements, and didn’t substantially influence the verdict, affect the fairness of the trial, or so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. See Sauser, ¶ 80; Maloy, ¶ 11. 2. Inflaming the Jury’s Passion ¶ 56 Lastly, Faudoa argues that the prosecutor improperly used arguments calculated to inflame the jury’s passion by saying the 
23 victim was traumatized and felt like she was going to die. Again, we are not persuaded. ¶ 57 Faudoa again challenges statements made at different times during the trial. Those statements include:  In opening statements: “[Y]ou’re . . . going to hear about how [the victim] sounded when she was saying those things [on the 911 calls] . . . . Crying and hysterical, screaming and traumatized.” (The court overruled defense counsel’s objection to the word “traumatized.”)  In opening statements: “You’re going to hear what it feels like to have had someone’s hand around your neck, to feel like you couldn’t breathe, to feel like you might die. You’re going to hear what that sounds like.” (The court didn’t rule on defense counsel’s objection but let the prosecutor rephrase the statement.)  In opening statements: “[Y]ou’re going to hear from a woman who has clearly gone through trauma.” (No objection was made to this statement.)  In closing argument: “[W]hat you heard [the victim’s sister-in-law] say is exactly what you guys heard on the 
24 911 call, which is someone that [has] experienced trauma.” (The court overruled defense counsel’s objection.)  In rebuttal closing: “[Faudoa] doesn’t get to strangle someone when she says bad things to him. He doesn’t get to make her feel like she is going to die.” (No objection was made to this statement.) ¶ 58 Prosecutors may use rhetorical devices and oratorical embellishments in opening statements and closing arguments. People v. Manyik, 2016 COA 42, ¶ 27; Strock, 252 P.3d at 1153. But such embellishments become improper if they induce the jury to determine guilt on the basis of passion or prejudice. Manyik, ¶ 27; Strock, 252 P.3d at 1153. ¶ 59 The evidence in this case — particularly the victim’s demeanor and statements during her 911 calls, the other witnesses’ testimony about her emotional state and her difficulty speaking shortly after she had made the calls, and the photos showing marks on her neck and face — supports an inference that the victim was traumatized when Faudoa choked her. That same evidence, along with the 
25 expert evidence on strangulation, also supports an inference that she may have felt she was going to die. ¶ 60 Thus, it was not improper for the prosecutor to make references to the victim’s trauma. See Maloy, ¶ 65 (prosecutor’s reference to the victim’s trauma wasn’t improper because, “[w]hile there was no direct evidence that [the victim] suffered trauma, reasonable jurors could have inferred that [she] would have experienced trauma based on the evidence presented”). Instead, as the trial court properly concluded, these were the type of oratorical embellishments that are allowed at trial. See Manyik, ¶ 27; Strock, 252 P.3d at 1153. III. Conclusion ¶ 61 The judgment is affirmed. JUDGE RICHMAN and JUDGE HARRIS concur.